**Public Version – Confidential/Highly Confidential Information Redacted**

### THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re: PARKING HEATERS ANTITRUST LITIGATION | Case No. 15-MC-940 (JG) (JO) |
| THIS DOCUMENT RELATES TO:<br><br>*All Direct Purchaser Class Actions* | |

<u>**CONSOLIDATED CLASS ACTION COMPLAINT AND JURY DEMAND**</u>

# <u>Public Version</u>

# <u>Unredacted Document Submitted</u>

# <u>UNDER SEAL</u>

**Public Version – Confidential/Highly Confidential Information Redacted**

## INTRODUCTION

1.      Plaintiffs Triple Cities Acquisition LLC d/b/a Cook Brothers Truck Parts; National Trucking Financial Reclamation Services; Trailer Craft Inc.; and Myers Equipment Corporation ("Direct Purchaser Plaintiffs") on behalf of themselves and all others similarly situated, for the Consolidated Class Action Complaint ("CAC") against Defendants Espar, Inc. and Espar Products Inc. (collectively "Espar"), and Webasto Thermo & Comfort North America Inc., and, Webasto Products North America, Inc. (collectively, "Webasto"), allege as follows based on (a) publicly available information, including Espar's price-fixing guilty plea, the European Commission's price-fixing investigation of Parking Heater (defined below) manufacturers; (b) personal knowledge of those matters relating to themselves, (c) the extensive investigation of their counsel, including the review of produced documents and other public filings concerning the conduct at issue in this action, and (d) information and belief.

## NATURE OF THE CASE

2.      This lawsuit is brought as a class action on behalf of Direct Purchaser Plaintiffs and all individuals and entities in the United States and its territories who purchased parking heaters for commercial vehicles sold in the aftermarket, including the heaters themselves, accessories sold for use with the heaters, and parking heater kits containing heaters and selected accessories (collectively, "Parking Heaters") directly from one or both Defendants or their affiliates from October 1, 2007 through December 31, 2012 ("Class Period").

3.      During the Class Period, Defendants marketed, distributed and/or sold Parking Heaters in the United States. Parking Heaters sold by the Defendants included two primary types: air heaters, which work by heating interior or outside air drawn into the heater unit, and water or

**Public Version – Confidential/Highly Confidential Information Redacted**

"coolant" heaters, which are integrated into the engine coolant circuit and heat the engine as well as the interior compartment.

4.      The term "aftermarket" as it is used in the CAC means the market for Parking Heaters to be installed in vehicles after the vehicles have been sold by the original equipment manufacturers ("OEM").

## JURISDICTION AND VENUE

5.      Direct Purchaser Plaintiffs and the Class bring this action under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover damages, including treble damages, for the injuries sustained by Direct Purchaser Plaintiffs and the Class resulting from violations by Defendants of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

6.      This Court has jurisdiction over the subject matter of this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15and 26, and 28 U.S.C. §§ 1331 and 1337.

7.      Venue is proper in this district pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Direct Purchaser Plaintiffs' claims occurred in this district, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this district, and one or more of the Defendants are licensed to do business in, are doing business in, had agents in, or are found or transact business in this district.

8.      This Court has *in personam* jurisdiction over each of the defendants because, *inter alia*, each defendant: (a) transacted business in the United States, including in this district; (b) directly or indirectly sold or marketed substantial quantities of Parking Heaters throughout the United States, including in this district; (c) had substantial aggregate contacts with the United States as a whole, including in this district; or (d) was engaged in an illegal price-fixing conspiracy

**Public Version – Confidential/Highly Confidential Information Redacted**

that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this district.

9.       The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States.

## PARTIES

### A. Plaintiffs

10.      Plaintiff Triple Cities directly purchased Parking Heaters from Defendants Espar and/or Webasto during the Class Period, paying more for the parking heaters than it would have absent the anticompetitive conduct of Defendants and their unnamed co-conspirators, and was injured as a result. Triple Cities has branch store locations in Utica, Rochester, Watertown, Homer and Elmira, New York; and in Scranton, Mechanicsburg and Pittson, Pennsylvania. Its principal place of business is at 76 Frederick Street, Binghamton, NY 13901.

11.      Plaintiff National Trucking Financial Reclamation Services, LLC is a limited liability company located in Little Rock, Arkansas. Plaintiff is the assignee of the legal interest and claims of a company that purchased Parking Heaters and Parking Heater accessories sold by Defendants Espar and/or Webasto during the Class Period, which company, as a result of the conspiracy described herein, was damaged and paid more for Parking Heaters than it would have in the absence of the price-fixing conspiracy.

12.      Plaintiff Trailer Craft Inc. is located in Anchorage, Alaska and purchased Parking Heaters directly from Defendants Espar and/or Webasto during the Class Period, at a price artificially inflated by the anticompetitive conduct of Defendants and their co-conspirators, and was injured thereby.

**Public Version – Confidential/Highly Confidential Information Redacted**

13.     Plaintiff Myers Equipment Corporation is an Ohio corporation with its principal place of business in Canfield, Ohio. Plaintiff directly purchased Parking Heaters from Defendant Webasto Products North America, Inc. during the Class Period, paying more for the parking heaters than it would have absent the anticompetitive conduct of Defendants and their unnamed co-conspirators, and was injured as a result.

**B. Defendants**

14.     Defendant Espar, Inc. is an Illinois corporation with its principal place of business in Novi, Michigan. On June 25, 2015, Espar, Inc. was sentenced to pay a $14.9 million criminal fine after pleading guilty to participating in a scheme to fix prices for Parking Heaters used in commercial vehicles.

15.     Defendant Espar Products Inc. is located at 6099A Vipond Drive, Mississauga, Ontario L5T 2B2, Canada. It is an affiliate of Defendant Espar, Inc.

16.     Defendant Eberspaecher Climate Control Systems GmbH & Co. KG ("Eberspaecher") is located at Eberspaecherstrasse 24, Esslingen, D-73730, Germany, and is the parent of Espar, Inc.

17.     Defendant Webasto Products North America, Inc. ("WPNA") is a Michigan corporation with its principal place of business in Fenton, Michigan. WPNA is the parent corporation of its wholly owned subsidiary, Defendant Webasto Thermo & Comfort North America Inc. ("WTNA").

18.     Defendant Webasto Thermo & Comfort North America Inc. is headquartered in Fenton, Michigan. WTNA is a wholly-owned subsidiary of WPNA.

19.     Defendant Webasto Thermo and Comfort SE ("Webasto Thermo"), located at Kraillinger Straße 5, Stockdorf, 82131, Germany, and is the parent of WPNA and WTNA.

**Public Version – Confidential/Highly Confidential Information Redacted**

20.     WPNA and WTNA are wholly-owned subsidiaries of Webasto SE, a German company headquartered at Kraillinger Straße 5,82131, Stockdorf, Germany.

<u>AGENTS AND CO-CONSPIRATORS</u>

21.     Each Defendant acted as the principal of or agent for other Defendants with respect to the acts, violations, and common course of conduct in this CAC.

22.     Various other persons, firms and corporations not named as Defendants have participated as co-conspirators with the Defendants and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anti-competitive conduct.

23.     Whenever this CAC refers to any act, deed, or transaction of any corporate entity, that allegation means that the corporate entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

<u>INTERSTATE TRADE AND COMMERCE</u>

24.     Defendants Espar and Webasto are the leading manufacturers of Parking Heaters sold in the United States

25.     During the Class Period, Espar and Webasto, directly or through one or more of their affiliates, sold and shipped substantial number of Parking Heaters throughout the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial district.

26.     During the Class Period, Espar had more than $62 million in commerce in Parking Heaters in the United States. ████████████████████████████████
████████████████████████████

**Public Version – Confidential/Highly Confidential Information Redacted**

27.     Defendants' activities, including the marketing and sale of Parking Heaters, has taken place within, and have had and were intended to have, a direct, substantial and reasonably foreseeable anti-competitive effect upon interstate commerce within the United States and upon import commerce with foreign nations.

28.     The restraints alleged in this CAC have directly and substantially affected interstate commerce in that Defendants have deprived Plaintiffs and the Class of the benefits of free and open competition in the purchase of Parking Heaters throughout the United States.

29.     Defendants' agreement to inflate, fix, raise, maintain or artificially stabilize prices of Parking Heaters and their actual inflating, fixing, raising, maintaining or artificially stabilizing those prices was intended to and had a direct, substantial and reasonably foreseeable effect on United States commerce and on import trade and commerce with the United States.

## CLASS ACTION ALLEGATIONS

30.     Direct Purchaser Plaintiffs bring this action on behalf of themselves and, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), as representatives of a Class defined as follows:

> All persons or entities (but excluding federal and state government entities and Defendants, their officers, directors, and employees, as well as Defendants' parents, predecessors, successors, subsidiaries, affiliates) that purchased Parking Heaters in the United States, its territories or possessions, directly from any Defendant, or from any of their parents, predecessors, successors, subsidiaries, or affiliates, at any time during the period from and including October 1, 2007 up to and including December 31, 2012.

31.     Members of the Class are so numerous and geographically dispersed across the United States that joinder is impracticable. While the exact number of Class members is unknown to Plaintiffs, it is believed to be in the tens of thousands and geographically dispersed throughout

**Public Version – Confidential/Highly Confidential Information Redacted**

the United States. Furthermore, the Class is readily identifiable from information and records in possession of the Defendants.

32.     Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and the Class were damaged by the same wrongful conduct by the Defendants. That is, they have paid artificially inflated prices for Parking Heaters as a result of Defendants' anti-competitive and unlawful conduct.

33.     Plaintiffs are members of the Class and will fairly and adequately protect and represent the interests of the Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class.

34.     Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation.

35.     Questions of law and fact common to the Class predominate over questions, if any, that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class. Such generally applicable conduct is inherent in Defendants' anti-competitive and unlawful conduct.

a) whether Defendants and their co-conspirators engaged in a contract, combination and/or conspiracy to fix, raise, maintain and stabilize prices of Parking Heaters sold in the United States and/or for delivery into the United States;

b) the identity of the participants in the conspiracy;

c) the duration of the conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

d) whether the conspiracy violated the Sherman Act;

e) whether the conduct of Defendants and their co-conspirators caused injury to the businesses and property of the Plaintiffs and the other members of the Class;

f) the effect of the conspiracy on the prices of Parking Heaters sold in the United States and/or for delivery into the United States during the Class Period; and

g) the appropriate measure of damages.

36.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and the Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

37.     The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants. Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

## FACTUAL ALLEGATIONS

**A.  Background**

38.     Operators of commercial vehicles are sometimes forced to idle their vehicles in order to stay warm during rest breaks and other stops, resulting in thousands of idling hours per

**Public Version – Confidential/Highly Confidential Information Redacted**

year. Idling burns hundreds of millions of gallons of fuel and releases hundreds of thousands of tons of dangerous gases into the atmosphere each year. These gases pose a variety of health risks and are damaging to the environment. And according to the United States Department of Energy, $1 billion is spent each year on idling-related engine repairs. To combat pollution and healthcare costs from idling, at least 31 states and dozens of municipalities have enacted anti-idling laws forcing commercial vehicle operators to find a greener solution to heat their vehicle cabins. Parking Heaters offer a solution to this problem.

39.     Parking Heaters produce heat without the need to run the vehicle's engine or idling. The Environmental Protection Agency ("EPA") has recommended Parking Heaters as an alternative to idling:

> Install a small generator or auxiliary power unit specifically designed for a truck that provides heat, air conditioning, and/or electrical power while the vehicle is not in motion. These devices are a better, more efficient alternative to idling as they use substantially less fuel and emit less pollution. Depending on the amount of time spent idling each year, the payback on these devices can be one to two years.
> http://www.epa.gov/region1/eco/diesel/pdfs/Diesel_Factsheet_Truck_Idling.pdf

40.     The EPA also has a Clean School Bus's National Idle Reduction Campaign that encourages communities to take actions to curb school bus idling. The goal of the program is to encourage idle reduction to protect the health of children, bus drivers and the community, as well as to improve air quality and to promote idle reduction as a simple way to save money by saving fuel and reducing wear and tear on engines, among other things.

http://www.epa.gov/cleandiesel/sector-programs/antiidling.htm

41.     Upon information and belief, Espar and Webasto are the only Parking Heater manufacturers that sell Parking Heaters in the United States. As a result, Parking Heaters sold by

**Public Version – Confidential/Highly Confidential Information Redacted**

Espar and Webasto dominate the market for Parking Heaters in the United States and include two primary types: (1) air heaters, which work by heating interior or outside air drawn into the heater unit, and (2) water or "coolant" heaters, which are integrated into the engine coolant circuit and heat the engine as well as the interior compartment.

**B.  Air Heaters**

42.     Air heaters act like small furnaces, with a heating element and blower providing bunk (cab) heat either via direct ducting or via the vehicle's factory-installed HVAC ducting. Air heaters work by heating the air and propelling it into the vehicle compartment to maintain a desired temperature range without idling. Their heating capacities range from 6,800 to 13,600 Btu/hour and they draw from as little as 0.7 up to 11.2 amps of battery power while in use. Air heaters are about the size of a loaf of bread and weigh around 6 to 8 pounds. They are usually mounted under or behind the outside of the sleeper cab, with their fuel pumps plumbed directly from the vehicle's fuel tank.

43.     Air heaters are very fuel efficient, burning from as little as 0.02 to 0.13 gallons of fuel per hour, using, on average, a gallon of fuel during a 24 hour period. During the Class Period, Espar's air heater models included the Airtronic D2, Airtronic D4 and Airtronic D5 heaters; and Webasto's models included at least the Air Top 2000ST & 2000D and Air Top Evo 3900 air heaters.

44.     Below is a diagram of Espar's Airtronic air heater:

**Public Version – Confidential/Highly Confidential Information Redacted**



### C.  Coolant Heaters

45.     Coolant heaters mainly heat the vehicle's engine and act like hot water furnaces, using the vehicle's own supply of fuel to produce the needed heat. Fuel and air are combined in the systems, generating heat in a combustion chamber. The heater's water-pump warms and circulates engine coolant throughout the vehicle's engine's cooling system to transfer heat to the engine. Some higher Btu capacity models also provide supplemental heating to vehicle cab space.

46.     Coolant heaters regulate the engine's coolant temperature by cycling the heater between various heat levels, depending upon ambient temperature, to maintain appropriate engine coolant heat. This eliminates the need for cold starts. Heat output ranges from 17,100 up to 45,000 Btu/hour and use just 1.9 to 7.5 amps.

**Public Version – Confidential/Highly Confidential Information Redacted**

47.     Coolant heaters are relatively compact and can be mounted under the hood near the engine or along the frame rail. They are plumbed to the vehicle's fuel tank and burn between 0.07 to 0.4 gallon of fuel per hour. Most models weigh around 6 to 7 pounds.

48.     During the Class Period, Espar coolant heater models included the Hydronic H5 D4 and D5 heaters; and Webasto's models included the Thermo Top C, Thermo 90 ST and DBW 2010 heaters.

49.     Below is a diagram of Espar's Hydronic D5 SC coolant heater:



50.     The prices of Parking Heaters range from $800 to $1,500 depending on the type, BTU capacity, remote control and other options. During the Class Period, Espar and Webasto were the primary manufacturers and sellers of Parking Heaters for the North American market.

**Public Version – Confidential/Highly Confidential Information Redacted**

51.     During the Class Period, Defendants Espar and Webasto ██████████ ████████████████████ the United States market for Parking Heaters.

**D.  The Characteristics of the Parking Heaters Market are Conducive to Collusion**

52.     The structure and characteristics of the Parking Heater market in the United States are conducive to a price-fixing agreement.

53.     Parking Heaters are sold by manufacturers through distributors, dealers and directly to original equipment manufacturers as well as owners of commercial vehicle fleets. Espar entered into contracts with "Master Sales and Service Dealers" to distribute and service its Parking Heaters. Each dealer is assigned a geographic territory to sell, install and repair Espar's heaters. Espar's network of dealers includes over 250 dealers that sell, install and repair its Parking Heaters throughout the United States. Similarly, ███████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████

54.     All Parking Heaters serve the same purpose of heating the interior motor vehicle cabin space while the engine is turned off. Parking Heaters manufactured by the Defendants also have comparable specifications, such as fuel consumption, size and weight. Espar and Webasto manufacture the leading Parking Heaters in this range: Espar's Airtronic D2 model and Webasto's Air Top 2000 ST model. Both models expend approximately the same amount of fuel per hour of operation, are approximately the same size and have similar features. Moreover, the EPA has conducted tests and determined that defendants' heaters "provide a similar idle reduction benefit." Therefore, purchasers of Parking Heaters are more likely to be influenced by price when making a purchasing decision. However, based upon information and belief, Defendants charged almost

14

**Public Version – Confidential/Highly Confidential Information Redacted**

identical prices for their respective Parking Heaters of comparable specifications throughout the Class Period.

55.     In addition, the EPA has recommended only Espar's and Webasto's heaters for use in commercial vehicles, including in Class 8 trucks and school buses. The EPA recommended models included Espar's Airtronic heaters and Webasto's Airtop 2000 models for installation in trucks; and Espar's EGuardian models and Webasto's TSL 17 and Scholostic models for installation in school buses.

56.     Purchasers routinely source their Parking Heaters from one of the Defendants. For example, New York State Department of Transportation lists Webasto and Espar as the only "approved" suppliers of Parking Heaters.

57.     As a result, the United States market for Parking Heaters is dominated by Defendants. Espar is one of the largest suppliers of Parking Heaters in North America. Webasto touts itself as the North American leader in "engine-off" heaters for commercial vehicles.

58.     There are substantial barriers that preclude or reduce entry into the Parking Heater market. The primary barriers to entry include high start-up costs, manufacturing expertise and know-how and access to distribution channels. For example, Espar's Master Sales and Service Dealers are forbidden from distributing competitors' Parking Heaters within their territories.

59.     Throughout the Class Period, Defendants possessed sufficient market power (accounting for virtually all Parking Heater sales) to raise prices for Parking Heaters above competitive levels in the United States markets.

60.     There are no substitutes for Parking Heaters. Alternative technologies are more expensive, difficult to install and have limited heating capability. For example, auxiliary power units ("APUs") or generator set systems ("gen-sets"), which incorporate an HVAC system, cost

**Public Version – Confidential/Highly Confidential Information Redacted**

three to eight times as much as Parking Heaters. A gen-set can cost upwards of $8,000 or more compared to Parking Heaters' price tag of often less than $1,500 or less. APUs and gen-sets are more complex to install, add significant weight to the truck cab and require more maintenance. Parking Heaters, however, can be installed in a few hours by drilling a few holes and running fuel lines. And battery powered APUs have a limited run time of about 10 hours. As such, Parking Heaters constitute a distinct product market.

61.     The commodity-like nature of Parking Heaters, along with the high barriers to entry into the industry and the fact that the market is highly concentrated, make the Parking Heater market susceptible to anticompetitive conduct and make the conspiracy alleged herein plausible, particularly in light of Espart's plea agreement ████████████████ (discussed below), and the opportunities Espar and Webasto had to conspire at the various trade show meetings they each attended.

62.     During the Class Period, the Defendants had ample opportunities for collusion and opportunities to fix the price of Parking Heaters. Defendants routinely attended trade shows and yearly truck shows. For example, during March 4-6, 2009, defendants Espar and Webasto attended the yearly NTEA World Truck Trade Show ("NTEA trade show"), which was held in Chicago, Illinois.

63.     During March 10-12, 2010, Defendants attended the NTEA trade show, which was held in St. Louis, Missouri.

64.     During March 8-10, 2011, Defendants attended the NTEA trade show, which was held in Indianapolis, Indiana.

65.     During March 4-7, 2012, Defendants attended the NTEA trade show, which was held in Indianapolis, Indiana.

**Public Version – Confidential/Highly Confidential Information Redacted**

### E.  **Defendants Agreed to Fix Prices For Parking Heaters**

66.     Defendants have engaged in a wide-ranging conspiracy during the Class Period to raise, fix, maintain or stabilize the price of Parking Heaters sold in the United States and have engaged in anti-competitive practices in furtherance of their conspiracy. As a direct result of the conspiracy alleged herein, Plaintiffs and the Class paid artificially inflated prices for Parking Heaters purchased from Defendants.

67.     The conspiracy was specifically directed toward reducing competition in the United States Parking Heater market and artificially inflating Parking Heater prices within the United States and succeeded in those objectives.

### 1.  **Government Investigations & Defendants' Participation**

68.     At least since January 26, 2015, the United States, through the New York office of the Antitrust Division of the DOJ, has been investigating unlawful and anticompetitive conduct in the Parking Heater industry.

69.     The DOJ has confirmed that its investigation into a conspiracy to fix prices for Parking Heaters is ongoing.

70.     As a result of the investigation, the criminal case discussed *infra* Part E.5 was brought against Defendant Espar, Inc.

██████████████████████████████████████████████

71.     Under the Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA"), DOJ may accord leniency to corporations reporting their illegal antitrust activity at an early stage, if they meet certain conditions. Under this policy, an applicant for leniency "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction or allocation of markets, customers, or sales or production volumes before it will receive a

**Public Version – Confidential/Highly Confidential Information Redacted**

conditional leniency letter." (Department of Justice, Frequently Asked Questions Regarding the Antitrust Division's Leniency Program and Model Leniency Letters (Nov. 19, 2008), http://www.usdoj.gov/atr/public/criminal/239583.pdf).

72. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

████████████████ Under ACPERA, a successful leniency applicant that provides "satisfactory cooperation" to plaintiffs bringing civil antitrust claims against it will be liable for only single damages in a successful civil antitrust action. ████████████████████████████

████████████

### 3. Espar's Guilty Plea

74.    On January 19, 2015, Defendant Espar, Inc. entered into a plea agreement with the United States, pleading guilty to violating one count of the Sherman Act for its participation in the conspiracy alleged herein.

75.    The Plea Agreement, which was approved by Espar's Board of Directors and Espar's counsel, states, among other things, that Espar, Inc.:

> through its directors, officers, and employees, including high level personnel of the defendant [Espar], participated in a combination and conspiracy to suppress and eliminate competition by agreeing to fix, stabilize, and maintain prices [of] parking heaters for commercial vehicles sold to aftermarket customers in the United States and elsewhere in North America, from at least as early as October 1, 2007 through at least December 31, 2012. In furtherance of the conspiracy, the defendant [Espar], through its directors, officers, and employees, engaged in communications and discussions and attended meetings with representatives of its co-conspirators. During these communications, discussions, and meetings, agreements were reached to fix, stabilize, and maintain prices on parking heaters to be sold to aftermarket customers in the United States and elsewhere in North America.

**Public Version – Confidential/Highly Confidential Information Redacted**

76.     Attachment A to the plea agreement, which has not been made public, contains the named of individuals "who have not received protection under the plea agreement but who have not been indicted."

77.     Under the plea agreement, Espar, Inc. agreed to pay a criminal fine of $14,970,000. No requirement to pay restitution to those harmed by Espar, Inc.'s conduct is contained within the plea.

78.     Additionally, under the plea agreement, Defendant Espar, Inc. agreed to cooperate with the DOJ in its ongoing investigation into the conspiracy alleged herein. This cooperation includes cooperation from both Espar Defendants, including Eberspaecher. Pursuant to this cooperation, Espar will provide documents to the DOJ and secure cooperation from officers, directors and employees, including through interviews and testifying before a grand jury if so called.

79.     Espar confirmed that it entered into a plea agreement for collusion related to Parking Heaters, with Espar's vice president of marketing and communication, John Dennehy, verifying the Department of Justice investigation into Espar's anticompetitive activity and stating that Espar "has cooperated fully with the US Department of Justice throughout this investigation."

80.     Following entry of Defendant Espar, Inc.'s plea agreement in this Court, the DOJ issued a press release stating that, "Today's plea demonstrates the [DOJ's] Antitrust Division's commitment to holding companies accountable for conspiracies that fix prices on parts used in every day products."

81.     Assistant Attorney General Bill Baer, the then-head of the Antitrust Division of the DOJ, also stated that "The Antitrust Division will vigorously prosecute companies that engage in

**Public Version – Confidential/Highly Confidential Information Redacted**

schemes that subvert normal competitive processes and defraud American consumers and businesses."

82.   On March 12, 2015, the U.S. Department of Justice filed a Criminal Information in the District Court for the Eastern District of New York along with a copy of the plea agreement. The Information charged that from October 1, 2007 through at least December 31, 2012, Espar, Inc. participated in a conspiracy among major Parking Heater manufacturers to fix the price of Parking Heaters for commercial vehicles in the aftermarket by agreeing to fix, stabilize and maintain prices for Parking Heaters sold to aftermarket customers in the United States and elsewhere in North America.

83.   The Information states that during the Class Period, for the purpose of forming and carrying out the charged conspiracy, Espar, Inc. and its co-conspirators knowingly did those things that they combined and conspired to do, including, among other things:

    a)   participating in communications, discussions, and meetings in the United States and elsewhere to discuss aftermarket prices for Parking Heaters for commercial vehicles;

    b)   agreeing, during those conversations and meetings, to set a price floor for Parking Heater kits for commercial vehicles sold to aftermarket customers in the United States and elsewhere in North America;

    c)   agreeing, during those conversations and meetings, to coordinate the timing and amount of price increases for Parking Heaters for commercial vehicles sold to aftermarket customers in the United States and elsewhere in North America;

**Public Version – Confidential/Highly Confidential Information Redacted**

> d)  exchanging information during those conversations and meetings for the purpose of monitoring and enforcing adherence to the agreements described in subparagraphs (b) and (c) above; and
>
> e)  selling Parking Heaters for commercial vehicles to aftermarket customers at collusive and non-competitive prices in the United States and elsewhere in North America.

84.  Pursuant to its plea agreement, Espar, Inc. pleaded guilty and made a factual admission of guilt to the violation charged. It further agreed and was sentenced on June 25, 2015 to pay a criminal fine of $14.97 million.

### 4.  The EU Commission Fined Espar

85.  As stated in a European Commission ("EC") press release dated June 17, 2015, the EC found that Espar and Webasto breached EC antitrust rules by fixing the price of Parking Heaters sold in Europe. According to the press release, from September 2001 until September 2011, Espar and Webasto coordinated prices and allocated customers in the entire European Economic Area (EEA). When the companies received requests for price quotations from customers, they discussed various price elements, agreed which of the two would submit the winning lower bid and exchanged other commercially sensitive information. The two companies also colluded by harmonizing their annual price lists and the discounts they gave to customers. The announcement came after more than two years of investigation that began with dawn raids in July 2013. The Commission fined Espar €68,175,000 for its involvement in the cartel. Webasto was not fined because it benefited from immunity for revealing the existence of the cartel to the Commission.

### 5.  The Conspiracy

**Public Version – Confidential/Highly Confidential Information Redacted**



**Public Version – Confidential/Highly Confidential Information Redacted**



**Public Version – Confidential/Highly Confidential Information Redacted**



**Public Version – Confidential/Highly Confidential Information Redacted**



**Public Version – Confidential/Highly Confidential Information Redacted**



114. had the effect of artificially stabilizing and inflating prices throughout the Class Period.

**Public Version – Confidential/Highly Confidential Information Redacted**

## PLAINTIFFS AND THE CLASS SUFFERED ANTITRUST INJURY

115.    Defendants' price-fixing conspiracy had the following effects, among others:

a)   Price competition has been restrained or eliminated with respect to Parking Heaters;

b)   The prices of Parking Heaters have been fixed, raised, maintained, or stabilized at artificially inflated levels; and

c)   Direct purchasers of Parking Heaters have been deprived of free and open competition.

116.    During the Class Period, Defendants charged supra-competitive prices for Parking Heaters sold by Plaintiffs and the Class. By reason of the alleged violations of the antitrust laws, Plaintiffs and the Class have sustained injury to their businesses or property, having paid higher prices for Parking Heaters than they would have paid in the absence of an illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## FRAUDULENT CONCEALMENT AND
## TOLLING OF THE STATUTE OF LIMITATIONS

117.    Throughout the Class Period and thereafter, the Defendants affirmatively and fraudulently concealed their unlawful conduct from discovery by Plaintiffs and the Class.

118.    Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy and the Defendants' involvement in the conspiracy alleged herein until February 11, 2015.

119.    On February 11, 2015, Triple Cities learned that Espar had conspired with Webasto to fix prices when it received a letter from the DOJ stating that it "is a potential victim of the crime to be charged" against Espar. *See* Exhibit A.

**Public Version – Confidential/Highly Confidential Information Redacted**

120.     Plaintiffs had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until Triple Cities received this letter on February 11, 2015.

121.     Defendants' unlawful activity to fix prices for Parking Heaters was inherently self-concealing. The communications between Defendants were not public information, rendering impossible any ascertainment of their specific misconduct.

122.     Because the conspiracy was inherently self-concealing and was, in fact, actively concealed by Defendants until March 12, 2015, when Espar, Inc.'s guilty plea was entered by this Court, Plaintiffs and members of the Class were, until the DOJ letter to Triple Cities, unaware of Defendants' unlawful conduct alleged herein, did not know that they were paying artificially high prices for Parking Heaters, and could not have stated facts plausibly suggesting a concerted and conspiratorial effort to conspire to fix prices for Parking Heaters.

123.     The affirmative acts of the Defendants and their co-conspirators alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection, as outlined in paragraphs 86 to 114 herein.

124.     Defendants and other unnamed co-conspirators agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy.

125.     Defendants and other unnamed co-conspirators met and communicated secretly concerning the pricing and marketing of Parking Heaters so as to avoid detection.

126.     In addition, Espar made affirmative representations during the Class Period that it priced competitively. For example, ███████████████████████████████████████ ████████████████████████████████████████████████████████. Similarly, in 2010,

**Public Version – Confidential/Highly Confidential Information Redacted**

Espar presented a report in which it stated that "Espar provides uncompromised quality at competitive pricing." ███████████████████████████████████

███████████████████████

127.    These false and misleading statements lulled Plaintiffs and members of the Class into believing that Parking Heater prices were the result of competitive market forces rather than the product of collusive efforts. These statements by Defendants were designed to, and did, put Plaintiffs and members of the Class off guard and cause them to accept the Parking Heater prices without undertaking further inquiry. Even had such inquiry been undertaken, it would have proven futile, because Plaintiffs and members of the Class did not have access to contemporaneous information that would have allowed them to evaluate whether the prices they were paying for Parking Heaters were competitive.

128.    Plaintiffs and members of the Class could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their unnamed co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination. The conspiracy as herein alleged was fraudulently concealed by various means and methods, including, but not limited to, secret meetings, misrepresentations to customers and surreptitious communications among Defendants and their unnamed co-conspirators by the use of the telephone or in-person meetings in order to prevent the existence of written records.

129.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and unnamed co-conspirators, Plaintiffs and the members of the Class had no knowledge of the alleged conspiracy, or of any facts or information which would have caused a reasonably diligent person to investigate whether a conspiracy existed.

130.    None of the facts or information available to Plaintiffs and members of the Class prior to February 11, 2015, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged herein prior to February 11, 2015.

131.    As a result of the Defendants' and their co-conspirators' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims of Plaintiffs and members of the Class as a result of the anticompetitive conduct alleged in this CAC.

## CLAIM FOR VIOLATION OF SHERMAN ACT § 1

132.    Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

133.    The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination or conspiracy were authorized, ordered or done by their high level officers, agents, employees or representatives while actively engaged in the management of Defendants' affairs.

134.    The anti-competitive acts were intentionally directed at the United States market for Parking Heaters and had a substantial and foreseeable effect on interstate commerce by raising and fixing Parking Heater prices throughout the United States.

135.    Defendants' and their unnamed co-conspirators' anti-competitive activities have proximately caused injury to Plaintiffs and the Class in the United States.

136.    As a direct and proximate result of the contract, combination, or conspiracy among Defendants alleged in this CAC, the prices charged to Plaintiffs and the Class for Parking Heaters were unlawfully raised, fixed, maintained, or stabilized in the United States.

**Public Version – Confidential/Highly Confidential Information Redacted**

137.   The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

138.   The contract, combination, or conspiracy had the following direct, substantial and reasonably foreseeable effects upon commerce in the United States and upon import commerce:

a)   Prices charged to Plaintiffs and the Class for Parking Heaters were raised, fixed, maintained or stabilized at supra-competitive levels;

b)   Plaintiffs and the Class have been deprived of the benefits of free, open and unrestricted competition in the markets for Parking Heaters; and

c)   Competition in establishing the prices paid for Parking Heaters has been unlawfully restrained, suppressed or eliminated.

139.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Class have been damaged in their business or property by paying prices for Parking Heaters that were higher than they would have been but for Defendants' unlawful conduct resulting in an amount of ascertainable damages to be established at trial.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray that:

A.   The Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.   The unlawful contract, combination, or conspiracy alleged herein be adjudicated and decreed to have been in violation of Section 1 of the Sherman Act;

**Public Version – Confidential/Highly Confidential Information Redacted**

C.      Joint and several judgments be entered for Plaintiffs and the Class against Defendants for three times the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees; and

D.      Plaintiffs and the Class be granted such other, further relief as the case may require or as the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

Date: April 22, 2016

Respectfully submitted,

**HAUSFELD LLP**                                  **ROBERTS LAW FIRM, P.A.**

_____/s/ Bonny E. Sweeney_____                    _____/s/ Michael L Roberts_____
   Bonny E. Sweeney                            Michael L. Roberts
600 Montgomery Street, Suite 3200                 Debra G. Josephson
San Francisco, CA 94111                           Stephanie E. Smith
Telephone: (415) 633-1908                         20 Rahling Circle
Facsimile: (415) 358-4980                         Little Rock, AR 72223
Email: bsweeney@hausfeld.com                      Tel: 501.476.7391
                                                  Facsimile: 501.821.4474
Michael D. Hausfeld                               Email: mikeroberts@robertslawfirm.us
Seth R. Gassman                                   Email: stephaniesmith@robertslawfirm.us
Jeannine M. Kenney                                Email: debrajosephson@robertslawfirm.us
HAUSFELD LLP
1700 K St. NW, Suite 650
Washington, D.C. 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
Email: mhausfeld@hausfeld.com
Email: sgassman@hausfeld.com
Email: jkenney@hausfeld.com

Brent Landau
HAUSFELD LLP
325 Chestnut St., Suite 900

**Public Version – Confidential/Highly Confidential Information Redacted**

Philadelphia, PA 19106
Telephone: (215-985-3270
Facsimile: (215) 985-3271
Email: blandau@hausfeld.com

*Co-Lead Counsel for the Direct Purchaser Plaintiff Class*

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
KOHN, SWIFT & GRAF, P.C.
One South Broad Street
Suite 2100
Philadelphia, PA 19107
Telephone: 215-238-1700
Facsimile: 215-238-1968
Email: jkohn@kohnswift.com
Email: whoese@kohnswift.com
Email: dabrahams@kohnswift.com

Jonathan W. Cuneo
Taylor Asen
CUNEO GILBERT & LADUCA, LLP
16 Court Street, Suite 1012
Brooklyn, NY 11241
Telephone: 202.789.3960
Facsimile: 202.589.1813
Email: jcuneo@cuneolaw.com
Email: tasen@cuneolaw.com

Arthur N. Bailey, Esq.
RUPP BAASE PFALZGRAF
CUNNINGHAM, LLC
1600 Liberty Building
424 Main Street
Buffalo, New York 14202
Email:  bailey@ruppbaase.com
Email:  cercone@ruppbaase.com
Email:  rupp@ruppbaase.com

Allan Steyer
D. Scott Macrae
STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP
One California Street
Suite 300
San Francisco, CA 94111
Telephone: (415) 421-3400
 Facsimile: (415) 421-2234
Email: asteyer@steyerlaw.com
Email: smacrae@steyerlaw.com

Solomon B. Cera
CERA LLP
595 Market Street, Suite 2300
San Francisco, California 94105
Telephone: (415) 777-2230
Email: scera@cerallp.com

C. Andrew Dirksen
CERA LLP
Prudential Tower 800
Boylston Street, 16th Floor
Boston, MA 02199
Telephone: (857) 453-6555
Email: cdirksen@cerallp.com

Jeffrey A. Klafter
KLAFTER OLSEN & LESSER LLP
Two International Drive, Suite 350
Rye Brook, NY 10573
Telephone: (914) 934-9200
Email: jak@klafterolsen.com

*Additional Plaintiffs' Counsel*