**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In Re:  PARKING HEATERS ANTITRUST LITIGATION | Case No. 15-MC-940 (DLI) (JO) Date of Service:  August 5, 2016 |
| THIS DOCUMENT RELATES TO: *All Indirect-Purchaser Class Actions.* | |

**INDIRECT-PURCHASER PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS ESPAR, INC., ESPAR PRODUCTS INC., WEBASTO PRODUCTS NORTH AMERICA, INC., AND WEBASTO THERMO & COMFORT NORTH AMERICA INC.'S COMBINED MOTION TO DISMISS INDIRECT-PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Francis O. Scarpulla (*pro hac vice*)
Patrick B. Clayton (*pro hac vice*)
LAW OFFICES OF FRANCIS O. SCARPULLA
456 Montgomery Street, 17th Floor
San Francisco, CA  94104
Telephone:  (415) 788-7210
Facsimile:  (415) 788-0706
Email: fos@scarpullalaw.com
       pbc@scarpullalaw.com

Josef D. Cooper (*pro hac vice*)
Tracy R. Kirkham (*pro hac vice*)
John D. Bogdanov (*pro hac vice*)
COOPER & KIRKHAM, P.C.
357 Tehama Street, Second Floor
San Francisco, CA  94103
Telephone:  (415) 788-3030
Facsimile:  (415) 882-7040
Email: jdc@coopkirk.com
       trk@coopkirk.com
       jdb@coopkirk.com

*Indirect-Purchaser Plaintiffs' Interim Co-Lead Counsel*

**TABLE OF CONTENTS**

Page No.

I.  INTRODUCTION                                                                1

II. ARGUMENT                                                                    1

A.  The Motion To Dismiss Plaintiffs' Injunctive Monetary Claims Should
    Be Denied                                                                  1

    1.  The "Threatened Conduct" Language of Section 16 is Not an
        Expression of Congressional Intent to Eliminate This Court's
        Authority to Consider an Award of Monetary Injunctive Relief           2

    2.  Disgorgement is an Available Remedy to Private Plaintiffs              6

    3.  *Illinois Brick* Does Not Adopt or Constitute A Congressional
        Limitation on this Court's Traditional Equitable Powers                8

B.  IPPs Properly Assert State-Law Claims                                     12

C.  IPPs Have Sufficiently Alleged The Nexus To Intrastate Commerce           16

    1.  IPPs' Claims May Proceed Under The Laws Of Nevada, New
        Hampshire, South Dakota, Virginia, West Virginia, And The
        District Of Columbia Because IPPs Have Alleged Sufficient
        Prohibited Conduct By Defendants                                       17

        a.  Nevada                                                             17

        b.  New Hampshire                                                      18

        c.  Florida                                                           18

        d.  Massachusetts                                                      19

        e.  South Dakota, Virginia, West Virginia, District of
            Columbia                                                           19

        f.  New York                                                          20

    2.  IPPs Have Sufficiently Alleged Substantial Effects On The
        Commerce And Citizens Of The States For Which They Seek
        Damages                                                                21

        a.  North Carolina, Tennessee, Wisconsin                              21

        b.  Montana, Nebraska                                                  23

i

**TABLE OF CONTENTS**
(continued)

Page No.

|  |  |  |  |  |
|---|---|---|---|---|
|  |  | c. | Utah | 24 |
|  | D. | IPPs Have Standing to Maintain Price-Fixing Claims | | 24 |
|  |  | 1. | Virginia | 24 |
|  |  | 2. | Missouri | 25 |
|  |  | 3. | South Carolina | 25 |
|  |  | 4. | Oregon and New Hampshire | 26 |
|  | E. | Arkansas, Rhode Island, And Michigan State Statures Are Applicable To Price Fixing | | 27 |
|  |  | 1. | Arkansas | 27 |
|  |  | 2. | Rhode Island | 28 |
|  |  | 3. | Michigan | 29 |
|  | F. | Class Actions Are Permitted Under Relevant State Law | | 30 |
|  | G. | IPPs Have Properly Pleaded Consumer-Protection Claims | | 32 |
|  | H. | Under the Fourth Claim for Relief, State Consumer Protection Statutes Definitively Apply to the Claims Asserted by the Class | | 34 |
|  |  | 1. | Missouri, Montana, and Rhode Island | 34 |
|  |  | 2. | New York | 36 |
|  |  | 3. | Vermont | 37 |
| III. | CONCLUSION | | | 39 |

# TABLE OF AUTHORITIES

<u>CASES</u>                                                           <u>Page No.</u>

*Ames v. Oceanside Welding and Towing Co., Inc.*
    767 A.2d 677 (R.I. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Allstate Ins. Co. v. Rozenberg*
    590 F. Supp. 2d 384, 395 (E.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37

*Arthur v. Microsoft Corp.*
    267 Neb. 586 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Bank v. Independence Energy Grp. LLC*
    736 F.3d 660 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

*Benedetto v. GMAC*
    2001 U.S. Dist. LEXIS 25286 (W.D. Mo. Apr. 5, 2001) . . . . . . . . . . . . . . .. 34, 36

*Baptist Health v. Murphy*
    226 S.W.3d 800 (Ark. 2006), aff'd 552 F.3d 659 (8th Cir. 2009) . . . . . . . . . 27, 28

*Blessing v. Sirius XM Radio Inc.*
    756 F. Supp. 2d 445 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

*California v. American Stores Co.*
    495 U.S. 271 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5, 10

*California v. ARC America Corp.*
    490 U.S. 93 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Campos v. Ticketmaster Corp.*
    140 F.3d 1166 (8th Cir. Mo. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Cappiello v. ICD Publications, Inc.*
    720 F.3d 109 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Cargill, Inc. v. Monfort of Colorado, Inc.*
    479 U.S. 104 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*
    754 F.2d 404 (1st Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Cox v. Microsoft Corp.*
    8 A.D.3d 39 (N.Y. App. Div. 1st Dep't 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

*Curtis Lumber Co. v. La. Pacific Corp.*
    618 F3d 762 (8th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

*Eldridge v. Eldridge*
    620 A.2d 1031 (N.H. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Elkins v. Microsoft Corp.*
    174 Vt. 328 (Vt. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Fed. Trade Comm'n v. Mylan Labs., Inc.*
    62 F. Supp. 2d 25 (D.D.C. 1999) . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . .4, 10

*Five for Entm't S.A. v. Rodriguez*
    877 F. Supp. 2d. 1231 (S.D. Fla. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Fond du Lac Bumper Exchange, Inc. v. Jui Li Enterprise Co., Ltd.*
    Nos. 09-CV-00852, 11-CV-00162, 2012 WL 3841397
    (E.D. Wis. Sept. 5, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Foti Fuels, Inc. v. Kurrle Corp.*
    90 A.3d 885 (Vt. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Freeman Indus., LLC v. Eastman Chem. Co.*
    172 S.W.3d 512 (Tenn. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*FTC v. Actavis*
    133 S. Ct. 2223 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

*Fucile v. Visa U.S.A. Inc.*
    No. S1560-03-CNC, 2004 WL 3030037 (Vt. Super. Ct. Dec. 27, 2004) . . . . . . . 38

*Gibbons v. J. Nuckolls, Inc.*
    216 S.W.3d 667 (Mo.2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 36

*Gold v. N.Y. Life Ins. Co.*, 730 F.3d 137, 140 n.1 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . 30

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*
    392 U.S. 481 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . 10, 11

*Illinois Brick Co. v. Illinois*
    431 U.S. 720 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11

*Independence County v. Pfizer, Inc.*
    534 F. Supp. 2d 882 (E.D. Ark. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*In re Actos End Payor Antitrust Litig.*
    No. 13-CV-9244, 2015 WL 5610752 (S.D.N.Y. Sept. 22, 2015) . . . . . . . . . . 33

*In re Aggrenox Antitrust Litig.*
    94 F. Supp. 3d 224 (D. Conn. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In re Auto Parts Antitrust Litig.*
    29 F. Supp. 3d 982 (E.D. Mich. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*In re Auto Parts Antitrust Litig.*
    No. 12-md-02311, 2014 WL 2993753 (E.D. Mich. July 3, 2014) . . . . . . . . .. 36

*In re Bayer Corp. Combination Aspirin Prods. Mktg & Sales Prac. Litig.*
    701 F. Supp. 2d 356 (E.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16

*In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*
    No. 1:14-md-2508, 2015 WL 5166014 (E.D. Tenn. June 24, 2015) . . . . . . . . 36

*In re Chocolate Confectionary Antitrust Litig.*
    602 F. Supp. 2d 538 (M.D. Pa. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . .27, 29, 34

*In Re Chocolate Confectionary Antitrust Litig.*
    749 F. Supp. 2d 224 (M.D. Pa. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re CRT Antitrust Litig,*
    No. 3:07-cv-5944, 2016 WL 721680 (N.D. Cal. Jan. 28, 2016) . . . . . . . . . . . .. .7

*In re CRT Antitrust Litig.*
    No. 3:07-cv-5944, 2016 WL 3648478 (N.D. Cal. July 7, 2016) . . . . . . . . . .. . 7

*In re Digital Music Antitrust Litig.*
    812 F. Supp. 2d 390 (S.D.N.Y. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Domestic Drywall Antitrust Litig.*
    MDL No. 13-2437, 2016 WL 3769680 (E.D. Pa. July 13, 2016) . . . . . . . . . . 35

*In re Domestic Drywall Antitrust Litig.*
    MDL No. 13-2437, 2016 WL 3769680 (E.D. Pa. July 13, 2016) . . . . . . . . 33

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*
    516 F. Supp. 2d 1072 (N.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 27, 35

*In re Dynamic Random Access Memory Antitrust Litig. (DRAM II)*
    536 F. Supp. 2d 1129 (N.D. Cal. 2008) . . . . . . . . . . . . . . . . . .20, 29, 33, 34

*In re Flash Memory Antitrust Litig.*
    643 F. Supp. 2d 1133 (N.D. Cal. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*In re Flonase Antitrust Litig.*
    692 F. Supp. 2d 524 (E.D. Pa. 2010) . . . . . . . . . . . . . . . . . .. . . . . . . . . . 18, 21

*In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litigation*
    1 F. Supp. 3d 34 (E.D.N.Y. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Hydroxycut Mktg. & Sales Practices Litig.*
    299 F.R.D. 648 (S.D. Cal. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 33

*In re Intel Corp. Microprocessor Antitrust Litig.*
    496 F. Supp. 2d 404 (D. Del. 2007) . . . . . . . . . . . . . . . . . . . . . . . . .17, 19, 33

*In re Lidoderm Antitrust Litig.*
    103 F. Supp. 3d 1155 (N.D. Cal. 2015) . . . . . . . . . . . . . . . . . . . . . .. . 22, 35

*In re Lithium Ion Batteries Antitrust Litig.*
    No. 13-md-2420, 2014 WL 4955377 (N.D. Cal. Oct. 2, 2014) . . . . . . . . . .. . .25, 27

*In re Microsoft Corp. Antitrust Litig.*, 401 F. Supp. 2d 461, 464 (D. Md. 2005) . . . . . . . . 25

*In re Multidistrict Vehicle Air Pollution Litigation*
    538 F.2d 231 (9th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . .3, 4

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*
    350 F. Supp. 2d 160 (D. Me. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10, 20

*In re Opana ER Antitrust Litig.*
    Case No. 14-C-10150, 2016 WL 521005 (N.D. Ill. Feb. 10, 2016) . . . . . . . . 33

*In re Optical Disk Drive Antitrust Litig.*
    No. 3:10-md-2143, 2012 WL 1366718 (N.D. Cal. Apr. 19, 2012) . . .. . . . . . . . 32

*In re Packaged Ice Antitrust Litigation*
        779 F. Supp. 2d 642 (E.D. Mich. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*In re Polyurethane Foam Antitrust Litig.*
        799 F. Supp. 2d 777 (N.D. Ohio 2011)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*In re Pool Products Distribution Market Antitrust Litig.*
        946 F.Supp.2d 554 (E.D. La. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In re Processed Egg Prods. Antitrust Litig.*
        851 F.Supp.2d 867 (E.D. Pa. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 35

*In re Refrigerant Compressors Antitrust Litig.*
        No. 2:09-md-02042, 2013 WL 1431756 at *20 (E.D. Mich. Apr. 9, 2013) . . . 19

*In re Silk*
        937 A.2d 900 (N.H. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*
        2015 U.S. Dist. LEXIS 125999 (D. Mass. Aug. 14, 2015) . . . . . . . . . . . . . . . 38

*In re Static Random Access Memory (SRAM) Antitrust Litig.*
        580 F. Supp. 2d 896  (N.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re TFT-LCD Antitrust Litig.*
        586 F. Supp. 2d 1109 (N.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . .20, 21, 34, 37

*In re TFT-LCD (Flat Panel) Antitrust Litig.*
        599 F. Supp. 2d 1179 (N.D. Cal. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*In re TFT-LCD (Flat Panel) Antitrust Litig.*
        No. M-07-1827, 2011 WL 4501223, (N.D. Cal. Sep. 28, 2011) . . . . . . . . . . . . 25

*Kansas v. Nebraska*
        135 S. Ct. 1042 (2015) . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . .  4

*Karlin v. IVF Am., Inc.*
        93 N.Y.2d 282 (N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . 36

*LaChance v. U.S. Smokeless Tobacco Co.*
        156 N.H. 88, 931 A.2d 571 (2007)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Lisk v. Lumber One Wood Preserving, LLC*
    792 F.3d 1331 (11th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 32

*Long v. Dell, Inc.*
    93 A.3d 988 (R.I. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

*Lucas Automotive Engineering Inc. v. Bridgestone/Firestone Inc.*
    140 F.3d 1228 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Lyons v. Litton Loan Servicing LP*
    __F. Supp. 3d__, 2016 WL 415165 (S.D.N.Y. Feb. 2, 2016) . . . . . . . . . . . 13, 15

*Mahon v. Ticor Title Insurance Company*
    683 F.3d 59 (2nd Cir. 2012) . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . 14

*Midwest Paper Prods. Co. v. Cont'l Group*
    596 F.2d 573 (3d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*MVB Collision, Inc. v Allstate Ins. Co.*
    129 A.D.3d 1041 (N.Y. App. Div. 2d Dep't 2015) . . . . . . . . . . . . . . . . . . . . .. . . 36

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*
    693 F.3d 145 (2nd Cir. 2012) . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . 15

*New York v. Feldman*
    210 F. Supp. 2d 294 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. .36, 37

*Olstad v. Microsoft Corp.*
    700 N.W.2d 139 (Wis. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Oregon v. AU Optronics Corp. (In re TFT-LCD (Flat Panel) Antitrust Litig.)*
    MDL No. 1827, No. C 10-4346 SI, 2011 WL 2790179
    (N.D. Cal. July 11, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Ortiz v. Fibreboard Corp.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*Paltre v. General Motors Corp.*
    26 A.D.3d 481 (N.Y. App. Div. 2d Dep't 2006) . . . . . . .36

*Porter v. Warner Holding Co.*
    328 U.S. 395 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Ramirez v. STi Prepaid LLC*
    644 F. Supp. 2d 496(D.N.J. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Reid v. GMC Skin Care USA Inc.*
    No. 8:15-CV-277, 2016 WL 403497 (N.D.N.Y. Jan. 15, 2016) . . . . . . . . . . . . . 15

*Rohrer v. Knudson*
    203 P.3d 759 (Mont. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

*Sawyer v. Robson*
    915 A.2d 1298 (Vt. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. 37

*Shady Grove Orthopedic Assoc. v. Allstate Ins. Co.*
    549 F.3d 137 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

*Spokeo Inc. v. Robins*
    136 S. Ct. 1540 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. 13

*State ex rel. Bryant v. R & A Inv. Co.*
    985 S.W.2d 299 (Ark. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Stoltz v. Fage Dairy Processing Industries, S.A.*
    No. 14-CV-3826-MKB, 2015 WL 5579872 (E.D.N.Y., September 22, 2015) . . . . . .16

*Strizver v. Wilsey*
    210 Or.App. 33, 150 P.3d 10 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Suchanek v. Sturm Foods, Inc.*
    311 F.R.D. 239(S.D. Ill. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Sullivan v. DB Investments, Inc.*
    667 F.3d 273 (3rd Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

*Tasty Baking Co. v. Ralston Purina, Inc*
     653 F.Supp. 1250 (E.D. Pa. 1987) . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Temple v. Circuit City Stores, Inc.*
    No. 06-CV-5303 (JG), 2007 WL 2790154  (E.D.N.Y. September 25, 2007) . . .. . . . . 16

*United States v. Carson*, 52 F.3d 1173 (2d Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Keyspan Corp.*
    763 F. Supp. 2d 633 (S.D.N.Y. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*United States Gypsum Co. v. Indiana Gas Co.*
    350 F.3d 623 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Vinion v. Amgen, Inc.*
    2004 U.S. Dist. LEXIS 31626 (D. Mont. Aug. 30, 2004) . . . . . . . . . . . . 35

*Walden v. D B & D, LLC*
    No. CV-12-138, 2013 WL 322103 at *2 (D. Mont. Jan. 28, 2013) . . . . . . . . . . . . 35

*Wittman v. CB1, Inc.*
    No. CV 15-105, 2016 WL 3093427 (D. Mont. June 1, 2016) . . . . . .. . . . . . . . . . .31

**STATUTES**

15 U.S.C. § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

15 U.S.C. § 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

15 U.S.C. § 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

15 U.S.C. § 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . 1

18 U.S.C. § 1961 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Ark. Code § 4-88-107(a)(10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

Fla. Stat. Section 501.201, *et seq,*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Michigan Compiled Laws, Section 445.772 . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Michigan Compiled Laws, Section 445.773 . . . . . . . . . . . . . . . . . . . . . . . . . .29

Mass. Gen. Laws. Ch. 93A § 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Mont. Code §§ 30-14-103, *et seq.* . . . . 35

Mo. Rev. Stat. § 407.010, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25, 35

N.H. Rev. Stat. § 358-A:2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

N.Y. Gen. Bus. Law § 349 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 36

N.C. Gen. Stat. § 75-1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Or. Rev. Stat.§ 646.780 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

R.I. Gen Laws § 6-13.1-1, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

S.C. Code Ann. § 39-5-10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

Tenn. Code § 47-18-104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . 22

VT Stat Ann. 9 §§ 2453, *et seq.* . .. . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . .37

Va. Code Ann. Section 59.1-9.2, *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 24

## **OTHER AUTHORITIES**

7A Charles Alan Wright, *et al.*, *Federal Practice & Procedure*, § 1758 (3d ed.) . . . . . . . 31, 32

## **RULES**

Fed. R. Civ. P. 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P. 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . 1, 30

## I.      INTRODUCTION

Indirect-Purchaser Plaintiffs ("IPPs") respectfully submit this Memorandum of Law in opposition to Defendants Espar, Inc., Espar Products Inc., Webasto Products North America, Inc., and Webasto Thermo & Comfort North America Inc.'s Combined Motion To Dismiss The Indirect Purchasers' Consolidated Amended Class Action Complaint (the "Motion").  As explained below, the IPPs' Consolidated Amended Class Action Complaint (the "Complaint") properly pleads claims for relief under federal and state laws arising out of Defendants' anti-competitive conduct, which conduct Defendants do not dispute in their Motion.  Instead, Defendants quarrel with IPPs' assertion of equitable relief claims under federal antitrust law, despite the well-settled rule that indirect purchasers may seek such relief under the Clayton Act. Defendants also contend that some state-law claims cannot be maintained at this stage of the proceedings.  But these arguments – alternatively framed as challenges to the jurisdiction of this Court, or the plausibility of the Complaint – mistake the standard for withstanding a Rule 12, Fed. R. Civ. P., pleading motion with the requirements of certifying a class under Rule 23. Defendants' Motion must be denied.

## II.     ARGUMENT

### A.      The Motion To Dismiss Plaintiffs' Injunctive Monetary Claims Should Be Denied

Defendants argue that the Court's equitable jurisdiction to order disgorgement of illegal gains is eliminated by the language of Section 16 of the Clayton Act (15 U.S.C. § 26) that provides for injunctive relief "against threatened conduct that will cause loss or damage."  However, that language has never been held to limit the ability to obtain disgorgement of money obtained through price-fixing since the disgorgement of illegal gains provides a strong deterrent that can prevent threatened loss or damage from future price-fixing activities.  Moreover, that language on its face is insufficient to satisfy the constitutional requirements for a limitation on traditional norms of equitable jurisdiction, which clearly provide that injunctive relief can include an order of disgorgement.

1

Defendants further argue that to allow a claim for disgorgement as equitable monetary relief would undermine the policy enunciated in *Illinois Brick Co. v. State of Illinois*, 431 U.S. 720 (1977), of denying damages to downstream purchasers who must prove that an illegal overcharge was passed on to them. Defendants misapprehend both the nature of disgorgement and the scope of *Illinois Brick*. Disgorgement of profits is not limited by the amount of damages suffered by the individual plaintiff requesting the relief. Rather, disgorgement is measured by the overcharges illegally obtained by defendants, whether those came from individual plaintiffs or not. The reason for that is simple: disgorgement is designed to create a disincentive for defendants to engage in future violations of the law by preventing them from retaining past ill-gotten gains; it is not designed to reimburse individual or class plaintiffs. Even if an individual or class of plaintiffs were to limit their request for disgorgement to encompass an amount of money equivalent to that which they would claim as damages, such self-limitation would not operate to transform their request for disgorgement into a damages claim subject to pass-on proof. *Illinois Brick* applies to one specific type of claim brought under Section 4 of the Clayton Act (15 U.S.C. § 15), which claim relies on a certain measure of damage proof. If such proof is not implicated in a claim, *Illinois Brick* is irrelevant.

1. **The "Threatened Conduct" Language Of Section 16 Is Not An Expression Of Congressional Intent To Eliminate This Court's Authority To Consider An Award Of Monetary Injunctive Relief**

All federal courts are empowered with the discretion to do equity by employing the full scope of injunctive remedies, including disgorgement and restitution, unless Congress specifically limits that power by statute. *Porter v. Warner Holding Co*., 328 U.S. 395 (1946). Defendants request this Court to rule that even in the event that IPPs prove that Defendants engaged in criminal activity, the Court lacks the power to consider whether disgorgement or restitution of funds obtained in that activity is an appropriate equitable response. Therefore, Defendants bear the burden of demonstrating a specific congressional intent to eliminate those remedies in Section 16 of the Clayton Act. Defendants advance no argument grounded in evidence of congressional intent or legislative history. Rather, for antitrust authority, they rely

solely on a ruling of the Ninth Circuit in *In re Multidistrict Vehicle Air Pollution Litigation*, 538 F.2d 231, 233-34 (9th Cir. 1976), and then by analogy, a Second Circuit decision, *United States v. Carson*, 52 F.3d 1173 (2d Cir. 1995), which concerned the RICO statue (18 U.S.C. § 1961). Neither of these cases is authority for the issue presented by this motion, namely, whether there is evidence of a clear congressional intent in Section 16 to circumscribe this Court's general equitable powers.

*Porter* is the seminal decision on the scope of a federal court's equitable powers. There, the Administrator of the Office of Price Administration brought an action to enjoin a landlord who allegedly violated a World War II federal rent control law from charging rents in excess of the permitted maximum. *Porter*, 328 U.S. at 396. The statute under which the action was initiated provided that "the Administrator . . . may make application . . . for an order enjoining such acts or practices [in violation of the Emergency Price Control Act of 1942]." *Id.* at 397. In addition to an injunction against future illegal rent charges, the Administrator sought an order requiring the defendant to disgorge the illegal rents already collected. The Supreme Court agreed that a disgorgement order was within the scope of the district courts' equitable powers, despite the fact that the remedy was not provided in the Price Control Act, because "[u]nless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of [equitable] jurisdiction." *Id.* at 387-98. Indeed, the Supreme Court found that this concept was so fundamental that only a statement of unambiguous congressional intent can limit a federal court's general equitable powers:

> Moreover, the comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. *Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.* "The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction." *Brown v. Swann*, 10 Pet. 497, 503. * * * [W]here, as here, the equitable jurisdiction of the court has properly been invoked for injunctive purposes, the court has the power . . . to award complete relief even though the decree includes that which might be conferred by a court of law. *Alexander v. Hillman*, 296 U.S. 222, 241-242.

*Id.* at 399 (emphasis added).

Defendants argue that Section 16 provides for only "forward looking remedies," and that disgorgement and restitution are inherently backward-looking remedies indistinguishable from damages. They rely principally on *Vehicle Air Pollution*, 538 F.2d at 233-34. This Ninth Circuit decision is, as one court noted, "a somewhat confusing opinion" and "the sole [appellate] opinion addressing restitution and/or disgorgement under § 16." *Fed. Trade Comm'n v. Mylan Labs, Inc.*, 62 F. Supp. 2d 25, 40 (D.D.C. 1999).

*Vehicle Air Pollution*, in what is arguably dicta, described restitution and disgorgement as not being directed at "threatened loss or damage." *Vehicle Air Pollution,* 538 F.2d at 234. However, the facts of that case, which did not concern price-fixing and therefore the defendants had no illegally gained funds belonging to the plaintiffs, make it self-limiting. As the *Mylan Labs* court observed: "[the *Ninth* Circuit's] language suggests that a typical restitution or disgorgement scenario might fit within the contours of §16, such as where plaintiffs seek to deprive antitrust violators of the benefits of their illegal conduct." *Ibid*. The *Mylan Labs* court did not attempt to resolve this question, instead basing its denial of the remedies on *Illinois Brick* (which error will be discussed below).

Section 16 provides for equitable relief directed to preventing future anticompetitive harm. The Supreme Court in *Porter,* 328 U.S. at 400, resolved any doubt that restitution and disgorgement play such a role when it held that providing restitution or disgorgement "may be considered as an order appropriate and necessary to enforce compliance" with a statute. "Future compliance may be more definitely assured if one is compelled to restore one's illegal gains." *Ibid. See also, Kansas v. Nebraska*, 135 S. Ct. 1042, 1058 (2015) ("disgorgement will serve to stabilize a compact by conveying an effective message to the breaching party that it must work hard to meet its future obligations"). Defendants argue that their conspiracy has already ended, thus eliminating both the "threat" of future harm, and *ipse dixit*, IPPs' ability to obtain Section 16 equitable relief. However, these Defendants have not gone out of business and there is nothing

preventing them from entering into a future price-fixing conspiracy.  Stated simply, an antitrust violator is less likely to fix future prices if required to relinquish the benefits of its illegal conduct than if its ill-gotten gains are beyond the equitable reach of the federal courts.

Finally, the Supreme Court specifically considered the issue of whether the reference to future conduct acted as a congressional limitation on the scope of federal courts' traditional equitable powers in *California v. American Stores Co*., 495 U.S. 271 (1990).  There, the defendants advanced the fact that the merger at issue was completed as a reason to construe the equitable remedy of divestiture as beyond the intended purview of Section 16.  The Supreme Court disagreed, observing:  "Indeed, the evident import of Congress' reference to 'threatened loss or damage' *is not to constrict the availability of injunctive remedies against violations that have already begun or occurred*, but rather to expand their availability against harms that are as yet unrealized."  *American Stores*, 495 U.S. at 282, n. 8 (emphasis added).  The Court went on to elucidate this point, and in doing so, decided the question of whether the "threatened conduct" language in Section 16 operates to constitutionally constrain the available equitable relief:

> The second phase, which refers to "threatened conduct that will cause loss or damage," is not drafted as a limitation on the power to grant relief, but rather is a part of the general reference to the standards that should be applied in fashioning injunctive relief.  It is surely not the equivalent of a directive stating that unlawful conduct may be prohibited but structural relief may not be mandated.

*Id*. at 282 (emphasis added).

In *American Stores,* the Supreme Court was called upon to resolve a split in the circuits over whether divestiture was available as a remedy in a private action challenging an allegedly anticompetitive merger.  To resolve that issue, the Supreme Court engaged in a comprehensive examination of whether Section 16 encompasses all traditional equitable powers.  First, the Supreme Court endorsed the First Circuit's observation that, with regard to the construction of the words "injunctive relief," "we have no way of definitively determining the congressional intent in passing §16."  *Id*. at 279 (citing *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 428 (1st Cir. 1985)).  Nonetheless, it found that "there remains at least one secure

-5-

guidepost:  when Congress uses broad generalized language in a remedial statute, and that language is not contravened by authoritative legislative history, a court should interpret the provision generously so as to effectuate the important congressional goals." *Id.* at 279.  The Supreme Court then found that Section 16 "states no restrictions or exceptions to the forms of injunctive relief a private plaintiff may seek, or that a court may order . . . .  Rather, *the statutory language indicates Congress' intention that traditional principles of equity govern the grant of injunctive relief*." *Id.* at 281 (emphasis added).  In holding that Section 16 encompasses the remedy of divestiture, the Supreme Court found that it contains no restriction on this Court's general power to fashion equitable remedies:

> *Indeed, a fair reading of the entire legislative history supports the conclusion that §16 means exactly what it says when it endorses the 'conditions and principles' governing injunctive relief in courts of equity: that the provision should be construed generously and flexibly pursuant to principles of equity. . . .*  [R]ecently, in *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982), we observed that when Congress endows the federal courts with equitable jurisdiction, Congress acts aware of this longstanding tradition of flexibility.  "'Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied."'  *Ibid.*, quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946).

*Id.* at 294-295 (emphasis added).[1]

## 2.    Disgorgement Is An Available Remedy to Private Plaintiffs

In *United States v. Keyspan Corp.*, 763 F. Supp. 2d 633, 639 (S.D.N.Y. 2011), the Southern District of New York applied *Porter* to provide for the grant of disgorgement pursuant to Section 4 of the Sherman Act:

> Section 1 of the Sherman Act prohibits "[e]very contract,

---

[1] The *Illinois Brick* dissent, written by Justice Brennan and joined by Justices Marshall and Blackmun, provides a primer on the Congressional objectives and intent that the federal antitrust laws protect the rights of consumers, and provide a remedy "open[ing] the doors of justice to every man, whenever he may be injured by those who violate the antitrust laws." *Illinois Brick,* 431 U.S. at 755 (citations omitted).  The dissent also recognized the "paramount role in the enforcement of the fundamental economic policy of the nation" that is played by private antitrust litigants. *Ibid.*

combination . . . or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Section 4 invests a district court with "jurisdiction to prevent and restrain" § 1 violations, and charges "the Attorney General[] [with the duty] to institute proceedings in equity to prevent and restrain such violations." 15 U.S.C. § 4 (emphasis added). These provisions are broad and contain no language divesting a court of its "inherent equitable powers." *See Porter*, 328 U.S. at 398.

Subsequently, in *Oregon v. AU Optronics Corp. (In re TFT-LCD (Flat Panel) Antitrust Litig.),* MDL No. 1827, No. C 10-4346 SI, 2011 WL 2790179 (N.D. Cal. July 11, 2011), the Northern District of California held that disgorgement was an available equitable remedy under federal law for an indirect purchaser in a private action.  Although the court was considering equitable claims brought under the Oregon Antitrust Act, the court's decision was grounded on the similarity of the Oregon statute to federal law and the court's "determin[ation] that federal courts retain the power to order disgorgement under the Sherman Act."  2011 WL 2790179 at *4.

Defendants argue that this ruling is distinguishable on the grounds that it was based on an interpretation of Oregon law "which does not contain the same restrictions on available equitable relief found in Section 16 of the Clayton Act," (Motion at 16), as if such an assertion were contained in the *Oregon* opinion, which it clearly is not.  Defendants then quote a section of a Special Master's report in *In re CRT Antitrust Litig*, No. 3:07-cv-5944, 2016 WL 721680 (N.D. Cal. Jan. 28, 2016), that advances the argument that *Keyspan* and *Oregon* are distinguishable because they involve government enforcement efforts.[2]  While *Keyspan* was an enforcement action, *Oregon* was not.  There, the State of Oregon was not exercising its police powers, but was in federal court as a private plaintiff.[3]  The Clayton Act applies the same standard to state

---

[2] The Special Master's report regarding these issues was adopted without independent analysis by the district court.  *In re CRT Antitrust Litig.*, No. 3:07-cv-5944, 2016 WL 3648478 (N.D. Cal. July 7, 2016).

[3] As the *Oregon* court noted, the State of Oregon "filed this antitrust action in 2010, seeking to recover for damages caused by a global price-fixing conspiracy allegedly perpetrated by the major manufacturers of liquid-crystal display ('LCD') panels.  Oregon brought suit on behalf of itself, its agencies, political subdivisions, and local governments, and all natural persons residing in Oregon who were indirect purchasers of . . . products containing LCD panels . . . ."  *Oregon*, 2011 WL 2790179 at *1 (internal citations omitted).

governments seeking damages or equitable relief as it applies to all other private litigants.[4]

In point of fact, arguing over whether a plaintiff is a governmental entity or a private citizen is a red herring since the scope of available equitable relief turns on the question of whether Section 16 specifically or necessarily limits the scope of the judiciary's inherent equitable powers, not on the nature or identity of any particular plaintiff.  The Supreme Court held in *American Stores* that no such limitation exists.  As the *Oregon* court found, "[b]ecause chancery courts possessed the power to order equitable disgorgement in the eighteenth century" so too, "contemporary federal courts are vested with the same authority by the Constitution and the Judiciary Act."  2011 WL 2790179 at *3 (internal citations omitted).

### 3.   *Illinois Brick* Does Not Adopt Or Constitute A Congressional Limitation On This Court's Traditional Equitable Powers

Defendants' motion also asserts that any attempt by indirect purchasers to obtain monetary injunctive relief was conclusively foreclosed by the Supreme Court's decision in *Illinois Brick*.  This argument fails for two reasons.  First, *Illinois Brick* by definition is applicable only to actions brought under Section 4 of the Clayton Act.  Second, *Illinois Brick* does not so much as mention Section 16, and cannot possibly be found to elucidate a congressional intent to restrict federal courts' exercise of their traditional equitable authority.

It has been well-settled since 1979, two years after *Illinois Brick*, that federal equitable claims simply do not present "indirect purchaser" issues.  The leading case on this issue is the Third Circuit's decision in *Midwest Paper Prods. Co. v. Cont'l Group*, 596 F.2d 573, 591, 594 (3d Cir. 1979):

> Most significantly, however, §16 by its terms entitles a party to injunctive relief "when and under the same conditions and principles as injunctive relief against threatened conduct that will

---

[4] Hence, the State of California sought divestiture in *American Stores* pursuant to Section 16, like any private citizen, and the precedent it established has been used by numerous non-governmental entity plaintiffs seeking divestiture.  *See, e.g., Tasty Baking Co. v. Ralston Purina, Inc.*, 653 F.Supp. 1250 (E.D. Pa. 1987) (in which the court also rejected the argument that *Illinois Brick* made divestiture unavailable to indirect purchasers).

> cause loss or damage is granted by courts or equity." Mindful of
> the distinctions, courts have held . . . that a person may have
> standing to obtain injunctive relief even when he is denied standing
> to sue for treble damages. * * * [I]n contrast to treble damage suits,
> it would appear that no countervailing interests would be served by
> placing all indirect purchasers in a straightjacket, so to speak, and
> preventing them from taking any legal action to protect themselves
> from injury, inasmuch as the equity principles that are to be
> considered under §16 can effectively screen out those claimants
> that are undeserving of equitable relief.

*Midwest Paper* has been consistently followed by all federal courts to consider the issue.

*See, e.g., Lucas Automotive Engineering Inc. v. Bridgestone/Firestone Inc.,* 140 F.3d 1228, 1235

(9th Cir. 1998) ("indirect purchasers are not barred from bringing an antitrust claim for

injunctive relief against manufacturers."); *Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1172

(8th Cir. 1998) ("Indirect purchaser status does not bar the plaintiffs from seeking injunctive

relief under § 16 of the Clayton Act. The concerns of the direct purchaser rule have mainly to do

with the complexities of incidence analysis, complexities that do not arise when the courts must

consider the propriety of injunctive relief."); and *United States Gypsum Co. v. Indiana Gas Co.*,

350 F.3d 623, 627 (7th Cir. 2003) ("the direct-purchaser doctrine does not foreclose equitable

relief").

Indeed, although the application of *Illinois Brick* to Section 16 has never been squarely

presented to the Supreme Court (most likely because there is no split in the circuits), the Court

echoed the *Midwest Paper* holding in *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104,

110-111 (1986), when it noted:

> In order to protect against multiple lawsuits and duplicative
> recoveries, courts should examine other factors in addition to
> antitrust injury, such as the potential for duplicative recovery, the
> complexity of apportioning damages, and the existence of other
> parties that have been more directly harmed, to determine whether
> a party is a proper plaintiff under § 4. *See Associated General
> Contractors*, 459 U.S., at 544-545; *Illinois Brick Co. v. Illinois*,
> 431 U.S. 720 (1977). Conversely, under § 16, the only remedy
> available is equitable in nature, and, as we recognized in *Hawaii v.
> Standard Oil Co.*, "the fact is that one injunction is as effective as
> 100, and, concomitantly, that 100 injunctions are no more effective
> than one." 405 U.S., at 261. Thus, because standing under §16
> raises no threat of multiple lawsuits or duplicative recoveries, some
> of the factors other than antitrust injury that are appropriate to a
> determination of standing under §4 are not relevant under §16.

Defendants will no doubt point out that they are not contending that *Illinois Brick* bars indirect purchasers from seeking *any* equitable relief.  They are only asserting that *Illinois Brick* eliminates this Court's power to award equitable *monetary* relief because it would constitute a circumvention of the doctrine barring indirect purchaser damage recovery.  As noted above, this argument could only succeed if *Illinois Brick* were grounded in evidence of a congressional intent to remove disgorgement and restitution from the antitrust enforcement scheme available in indirect purchaser actions.  Since that decision never touches on the concept of equitable relief in any way, it is not authority for finding the "so many words" or "necessary and inescapable inference" of congressional intent required for such a limitation.  *American Stores,* 595 U.S. at 295.

Defendants' argument is grounded on the erroneous concept that *Illinois Brick* articulates a public policy of protecting antitrust violators from duplicative recovery, which can only be accomplished by the complete elimination of any cause of action that could lead to a monetary payment to indirect purchasers of the price-fixed product.  This assumption is made in every one of the cases cited by defendants.  *See, e.g., Mylan Labs,* 62 F. Supp. 2d at 41 (*Illinois Brick* would foreclose disgorgement to indirect purchasers because it "raise[s] the specter of duplicative recoveries"); and *In re New Motor Vehicles Canadian Exp. Antitrust Litig*., 350 F. Supp. 2d 160 (D. Me. 2004) (*dicta* in a case where the *Illinois Brick* bar to equitable recovery was not even litigated: "Certainly no restitutionary remedy can escape the limitations . . . [of] *Illinois Brick*, and the plaintiffs do not argue that it can").  This interpretation of *Illinois Brick* is simplistic and wrong.

To begin, *Illinois Brick* was not motivated by concerns for eliminating any possibility that a price-fixer could be faced with duplicative recovery.  It was motivated by the Supreme Court's belief that barring the "offensive" use of pass-on proof of damages is a necessary corollary to the prohibition on "defensive" pass-on evidence enunciated in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968).  The Supreme Court felt that fairness dictated that permitting antitrust recovery through proof of pass-on damages would require it to

-10-

overrule *Hanover Shoe,* which adherence to *stare decisis* made it hesitant to do.  *Illinois Brick,*
431 U.S. at 729.  Thus, as the Third Circuit, sitting *en banc*, recognized in *Sullivan v. DB
Investments, Inc.*, 667 F.3d 273, 313 (3rd Cir. 2011), *Illinois Brick* is essentially a rule of
evidence applicable to proof of damages.

Further, although *Illinois Brick* discusses the elimination of the "risk of duplicative
recoveries," along with the elimination of "evidentiary complexities and uncertainties" (431 U.S.
at 731-732) as benefits of a prohibition on pass-on damage proof, this "does not reflect a
categorical policy judgment that indirect purchasers do not merit antitrust protection." *Sullivan,*
667 F.3d at 313.[5]  Neither the letter nor spirit of *Illinois Brick* compels courts to bar any claim
that might conceivably result in a monetary payment to an indirect purchaser.

Nothing demonstrates that *Illinois Brick* was not intended to create an over-riding public
policy foreclosing all indirect purchaser monetary recovery more clearly than *California v. ARC
America Corp.,* 490 U.S. 93 (1979).  There, the Supreme Court considered the validity of the
ultimate "circumvention" of *Illinois Brick* – the California legislature's amendment of its
antitrust laws to explicitly permit proof of pass-on damages.  The Ninth Circuit had ruled that the
amendment was pre-empted "as an obstacle to effectuating the congressional purposes and
policies identified in *Hanover Shoe* and *Illinois Brick*."  *Id.* at 102.  However, the Supreme Court
disagreed and reversed, thus allowing an antitrust defendant in California to face the prospect of
duplicative recovery.  It explicitly rejected each of the Ninth Circuit's reasons for pre-empting
the Cartwright Act amendment, including the concept that *Illinois Brick* enunciated an "'express
federal policy' condemning multiple liability." *Id.* at 105.[6]

---

[5] Neither does it represent a determination that indirect purchasers suffer no injury, or that such
injury is too remote to be cognizable in antitrust enforcement.  As the Third Circuit, *en banc*,
observed, the *Illinois Brick* prohibition on proof of pass-on damages is "often confusingly"
referred to as the lack of "a statutory standing requirement."  *Sullivan*, 667 F.3d at 307.
However, as the *Sullivan* Court held, the many cases adjudicating *Illinois Brick's* application to
individual fact patterns demonstrate that the potential lack of *Illinois Brick* "standing" does not
prevent an indirect purchaser from "establish[ing] a justiciable case or controversy" in a federal
court.  *Ibid.*
[6] Indeed, the *Illinois Brick* decision itself invites "end-runs," carving out exceptions to the

There is simply no rationale for applying *Illinois Brick* to any aspect of a Section 16 claim, or to bar the remedies of restitution and disgorgement.  Neither remedy relies on proof of the amount of damages passed-on down a product's chain of distribution that is central to the holding of *Illinois Brick*.  As far as potential exposure of antitrust defendants to "multiple liability" is concerned, even if there were an express federal policy of protecting defendants from this fate, it is not necessary to categorically foreclose indirect purchasers from seeking equitable monetary relief.[7]  That is because these are equitable remedies.  Sitting in equity, district courts are entitled to consider an almost endless variety of factors in determining whether to grant and how to fashion relief.  One of these certainly would be whether the defendants had already paid full treble damages to direct purchasers.  In other words, at some point, the "duplicative recovery" arguments made by Defendants might be properly considered by this Court sitting in equity.  However, a motion to dismiss IPPs' equitable cause of action with prejudice is neither the time nor the place.

### B.      IPPs Properly Assert State-Law Claims

IPPs assert, as their Third and Fourth Claims for Relief, that Defendants' price-fixing conduct violated the antitrust, consumer protection, and unfair competition laws of 32 states and the District of Columbia.  Defendants argue that the individuals and entities currently serving as the named IPPs – residents of Illinois, Iowa, Minnesota, Mississippi, New Jersey, and New York – lack standing to assert claims for injuries caused by Defendants' conduct arising under the laws

---

prohibition on pass-on recovery in situations where the complexity of the proof would be demonstrably lessened, such as where there is a pre-existing cost-plus contract between the direct and indirect purchasers, and "where the direct purchaser is owned or controlled by its customer." *Illinois Brick,* 431 U.S. at 736 and n. 16.  In fact, the Supreme Court left open the door for courts to permit recovery in "[a]nother situation in which market forces have been superseded," so that traditional notions of pass-on of overcharges are not required to demonstrate injury to the indirect purchaser.  *Id.* at 736 and n.16.

[7] It should go without saying that "multiple liability" and "duplicative recovery" do not refer to the situation in which a single defendant is subject to suit by more than one plaintiff or category of plaintiffs.  The federal antitrust laws provide that a violator shall pay three times the damages caused by the illegal activity, and accordingly, no recovery becomes potentially duplicative until that full sum has been adjudicated and paid to another plaintiff.

of 28 jurisdictions where the named IPPs do not reside.  (IPPs do not assert claims under New Jersey law; thus the named IPPs are residents of five of the 33 jurisdictions at issue.)  Defendants do not challenge the Article III standing of the named IPPs to maintain claims in their "home" jurisdictions.[8]

Class action plaintiffs asserting state-law claims arising under the analogous laws of multiple jurisdictions, including those where the named plaintiffs do not reside, is both proper and logical.  "[I]n situations where a named plaintiff has established individual standing to bring specific claims against a defendant in her own right, and also asserts parallel common law claims arising under different states' law on behalf of a putative class," then "the issue is not whether the named plaintiff has standing to sue the defendant, but whether his or her injuries are sufficiently similar to those of the purported class to justify the prosecution of a nationwide class action, which is properly determined at the class certification stage."  *Lyons v. Litton Loan Servicing LP*, __F. Supp. 3d__, 2016 WL 415165 at *6 (S.D.N.Y. Feb. 2, 2016) (internal quotation marks and citation omitted).

This well-recognized class action principle stems from the Supreme Court's decision in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999), directing courts to defer standing objections until after class certification, where certification issues are "logically antecedent to Article III concerns."  Defendants acknowledge (Motion at 19, fn. 5) that the courts of this Circuit have followed the *Ortiz* "logical antecedence" principle to deny similar motions directed to multiple-jurisdiction class action complaints.  *See, e.g., In re Bayer Corp. Combination Aspirin Prods. Mktg & Sales Prac. Litig.*, 701 F. Supp. 2d 356, 377 (E.D.N.Y. 2010) ("Under the guise of standing, defendant has raised the issues of adequacy of the representatives and whether there are common questions of law or fact that predominate over any questions affecting only individual members.  These are issues to be addressed at the class certification stage.") (citations

---

[8] Defendants cite *Spokeo Inc. v. Robins*, 136 S. Ct. 1540 (2016), where the Supreme Court reaffirmed that a class action plaintiff who was not injured by the defendant lacked Article III standing.  Here, Defendants do not dispute that the named IPPs have alleged injury caused by Defendants' conduct.

omitted); *Blessing v. Sirius XM Radio Inc.*, 756 F. Supp. 2d 445, 452 (S.D.N.Y. 2010) ("the answer to [the class certification] question will determine whether there are plaintiffs with standing to bring claims under the laws of states in which no currently-named plaintiff resides.").[9]

Against the weight of authority expressly permitting IPPs to plead their multi-jurisdiction class action claims as they have done here, Defendants point to *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59 (2d Cir. 2012), and suggest that after *Mahon*, the *Ortiz* "logical antecedence" principle is no longer available to class action plaintiffs in this Circuit. Defendants are incorrect.

In *Mahon*, 683 F.3d at 60, the Second Circuit affirmed the dismissal of one of two defendant title insurance companies in a class action where the sole named plaintiff bought title insurance from only one defendant. The issue in that case, which alleged violations of a rate-setting statute, was not whether the named plaintiff could assert claims arising under the laws of jurisdictions where she did not reside. Rather, it was whether she could assert claims against a second defendant with whom she transacted no business, suffered no injury, and did not allege to be a conspirator with the other defendant. The Second Circuit held that she could not assert such a claim against the second defendant: "*Mahon*, however, fails to explain why a plaintiff's injury resulting from conduct of one defendant should have any bearing on her Article III standing to sue other defendants, even if they engaged in similar conduct that injured other parties." *Id*. at 66.

Here, the named IPPs allege they suffered injury caused by an antitrust conspiracy involving conduct by both Defendants, for which Defendants are joint-and-severally liable. Defendants' Motion does not dispute that the named IPPs have properly alleged injury to

---

[9] *See also In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 806 (N.D. Ohio 2011) ("If this Court grants class certification, the resulting class will contain individuals with standing to pursue claims under each of the state law claims. In the alternative, if this Court denies class certification, the [named plaintiffs] will be limited to pursue claims under the state antitrust and consumer protection statutes of the jurisdiction in which they reside. In either case, the supposed standing deficiencies will be resolved.").

themselves caused by Defendant's conduct.  Instead, Defendants' Motion challenges the assertion of additional claims on behalf of absent class members under laws of jurisdictions where the named IPPs do not reside.  In this situation, *Mahon* is inapposite, and *Ortiz* continues to control the analysis of the claims at issue.

The continuing viability of the *Ortiz* "logical antecedence" principle in this Circuit is confirmed by cases like *Lyons*, 2016 WL 415165, decided earlier this year.  In *Lyons*, the plaintiffs asserted state-law claims against an insurance company from whom they had purchased policies under the laws of the states in which the named plaintiffs resided, as well as under additional states in which the named plaintiffs did not reside.  The court rejected the same Article III standing challenge as Defendants assert here:  "Plaintiffs propose a nationwide class, including both claimants in the same states as the named plaintiffs and claimants outside those states, and the Article III objections concern only those out-of-state claimants.  But this latter group would not even be in the case if there were no class certification."  *Id*. at *7.  "Given that, it is not necessary for the Court to address potential standing issues regarding claimants outside the home states of the named plaintiffs prior to addressing class certification."  *Id*.  The same reasoning applies here.  *See also Reid v. GMC Skin Care USA Inc.*, No. 8:15-CV-277, 2016 WL 403497 at *8 (N.D.N.Y. Jan. 15, 2016) ("The Court will therefore defer the question regarding whether Plaintiffs may pursue claims on behalf of putative class members residing in other states to the class certification stage.").

Moreover, in a decision subsequent to *Mahon*, the Second Circuit reaffirmed that, in class actions, the question of whether named plaintiffs may maintain claims held by absent class members is not a question of Article III standing, but rather a question of class certification under Rule 23.  In *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012), the Second Circuit held that a plaintiff who had purchased some securities from the defendant issuer had standing to assert additional claims based on similar securities that the named plaintiff did not buy from the issuer.  The court explained that where the named plaintiff has Article III standing to assert claims based on the securities it purchased itself, the question as

-15-

to the other claims is one of "class standing," which "does not turn on whether [plaintiff] NECA would have statutory or Article III standing to seek recovery." *Id.* at 158.

The other decisions of this District cited by Defendants are distinguishable.  In *In re HSBC Bank USA, N.A., Debit Card Overdraft Fee Litig.*, 1 F. Supp. 3d 34, 48 (E.D.N.Y. 2014), the plaintiffs alleged that the defendant bank's practice of ordering debit card charges so as to maximize customer penalties violated various state laws.  The court granted the defendants' motion to dismiss claims from states where the named plaintiffs did not reside, reasoning that, "[t]o hold otherwise would allow Plaintiff to engage in lengthy and expensive discovery." *Id.* at 50.  However, discovery will be national in scope regardless of the outcome of the Motion because here, IPPs' nationwide non-monetary injunctive relief claims are unchallenged by Defendants' Motion.  *Cf. Temple v. Circuit City Stores, Inc.*, No. 06-cv-5303, 2007 WL 2790154 (E.D.N.Y. Sept. 25, 2007) (dismissing plaintiff's federal claim as implausible, dismissing claims from states where plaintiff did not reside, and remanding case to Tennessee).

Finally, Defendants' reference to *Stoltz v. Fage Dairy Processing Industry, S.A.*, No. 14-cv-3826, 2015 WL 5579872 (E.D.N.Y. Sept. 22, 2015), a false-advertising case, is particularly unavailing.  There, the named plaintiffs were only the fictitious "John Doe" and "Jane Doe." The court, citing *Bayer*, 701 F. Supp. 2d at 377, noted that, "at this preliminary stage of the litigation, the only relevant standing inquiry is that of the named plaintiffs," but because the named plaintiffs were fictitious, the court dismissed them.  *Id.* at *12.  Defendants make no such challenges to the named IPPs in the instant case.

Accordingly, and consistent with the weight of authority from this Circuit and elsewhere, Defendants' invitation to dismiss the state-law claims from jurisdictions where the named IPPs do not reside should be rejected.

### C.   IPPs Have Sufficiently Alleged The Nexus To Intrastate Commerce

Defendants' argument that IPPs have failed to sufficiently allege a nexus between Defendants' conduct and intrastate commerce is incorrect.  The statutes under which the IPPs bring claims were enacted specifically for the purpose of providing remedies for victims of

antitrust cartels.  The statutes at-issue permit claims to be brought when a plaintiff alleges that an illegal overcharge was paid in a state as a result of a price-fixing violation, and such an impact is deemed to be the requisite effect on intrastate commerce which gives rise to a cause of action.

**1.     IPPs' Claims May Proceed Under The Laws Of Nevada, New Hampshire, South Dakota, Virginia, West Virginia, And The District Of Columbia Because IPPs Have Alleged Sufficient Prohibited Conduct By Defendants**

Defendants argue that the *Illinois Brick*-repealer statutes of Nevada, New Hampshire, South Dakota, West Virginia and the District of Columbia only apply to claims based upon conspiratorial conduct occurring in those jurisdictions.  Motion, at 22-23.  This argument is mistaken, as each of these jurisdictions permit claims to be brought when any illegal price-fixing conspiracy causes illegal overcharges to be paid in those jurisdictions.

**a.     Nevada**

IPPs' Nevada claims should proceed.  *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179 (N.D. Cal. 2009) (finding similar allegations sufficient to state a claim under the Nevada statute).  In *TFT-LCD*, the plaintiffs alleged similar facts[10] regarding the defendants' conspiracy to restrain and suppress prices of LCDs nationwide as the IPPs do here regarding Parking Heaters.  *See* Complaint at ¶¶ 76-103.  *See also In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404, 413-14 (D. Del. 2007) (denying motion to dismiss Nevada claim where complaint alleged nationwide price-fixing conspiracy and goods sold in Nevada because "it is reasonable to infer from Class Plaintiffs' allegations of indirect purchaser injury throughout the United States that Class Plaintiffs' allegations of anticompetitive conduct by Intel include the sale of the x86 microprocessor in Nevada markets").

---

[10] "The complaint alleges that 'LCD price competition was restrained, suppressed, and eliminated throughout [state],' 'LCD prices were raised, fixed, maintained and stabilized at artificially high levels through [state],' and that plaintiffs 'were deprived of free and open competition' and 'paid supra competitive, artificially inflated prices for LCD.'" *TFT-LCD*, 599 F. Supp. 2d at 1188.

### b.      New Hampshire

Defendants move to dismiss IPPs' claims under N.H. Rev. Stat. § 358-A:2 on the ground

that the proscribed conduct must occur within the state.  However, IPPs have sufficiently stated a

claim for relief under this statute by alleging that Defendants colluded to fix the product price

that was then sold in the New Hampshire market.  "The New Hampshire Supreme Court has

emphasized that [N.H. Rev. Stat. § 358-A:2] is broad in sweep, explaining that a pleading

sufficiently states a claim if the allegations encompass conduct which was part of trade or

commerce that had direct or indirect effects on the people of [New Hampshire]."  *In re*

*Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224, 235 (M.D. Pa. 2010) (citing

*LaChance v. U.S. Smokeless Tobacco Co.*, 156 N.H. 88, 931 A.2d 571, 578 (2007)) (internal

quotations omitted).  Specifically, the *Chocolate* court found that allegations of a nationwide

price-fixing conspiracy which forced plaintiffs in New Hampshire to pay supracompetitive prices

for chocolate were sufficient to show indirect effects on the residents of New Hampshire.

*Chocolate*, 749 F. Supp. 2d at 235.  Therefore, "[u]nder this broad standard, [the plaintiffs] have

sufficiently stated a claim for relief under Section 358-A:2."  *Id.*

Similarly, IPPs have alleged that Defendants and their co-conspirators violated the

antitrust and consumer protection laws of the states specified in the Complaint, including New

Hampshire. *See, e.g.*, Complaint at ¶ 104.  Defendants' alleged collusive activity encompasses

conduct that was "part of trade or commerce that had a direct" effect on New Hampshire

consumers.  *See* Complaint at ¶¶ 76-103, 147, 148, 156.  As such, IPPs' New Hampshire claims

should be sustained.

### c.      Florida

Defendants argue that the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat.

Section 501.201, *et seq.*, ("FDUTPA") "applies only to actions that occurred within the state of

Florida."  Motion at 22.  But this is precisely what IPPs have alleged.  *See* Complaint at ¶¶ 7, 76-

103, 147, 151.  Indeed, courts have broadly held that the FDUTPA does not require that injuries

take place entirely within the state.  *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 537 (E.D.

Pa. 2010).  The case cited by Defendants, *Five for Entm't S.A. v. Rodriguez*, 877 F. Supp. 2d.
1231 (S.D. Fla. 2012), was primarily a breach of contract case, not a nationwide price-fixing
conspiracy as alleged by IPPs.  Thus, IPPs' FDUTPA claims should proceed.

>        **d.**     **Massachusetts**

IPPs' Massachusetts claims should proceed under the Massachusetts Unfair Trade
Practices Act ("MUTPA").  Mass. Gen. Laws Ch. 93A § 11.  Defendants have offered no
analysis as to why IPPs' claims should be dismissed, other than that conspiratorial conduct needs
to occur "primarily and substantially within the commonwealth."  Motion at 22.  However, IPPs
have alleged that Defendants' executives met to facilitate the ongoing price-fixing and customer-
allocation activity with respect to Parking Heaters sold in the United States.  That same
conspiratorial conduct resulted in purchasers of Parking Heaters in Massachusetts paying
supracompetitive prices.  *See* Complaint at ¶¶ 39, 66-75, 76-103, 104, 147, 152.  It is
Defendants' burden to demonstrate the alleged insufficiency of these allegations, and they have
failed to carry this burden.  *See In re Refrigerant Compressors Antitrust Litig.*, No. 2:09-md-
02042, 2013 WL 1431756 at *20 (E.D. Mich. Apr. 9, 2013) (denying defendants' motion to
dismiss MUTPA claims, noting that "the MUTPA expressly provides that Defendants bear the
burden of proof on this defense").

>        **e.**     **South Dakota, Virginia, West Virginia, District of Columbia**

Defendants claim that the antitrust statutes of South Dakota, Virginia, West Virginia and
the District of Columbia each require "restraints of trade or commerce" within each state, and
that IPPs' allegations are not sufficient to support this intrastate nexus.  Motion at 22.  However,
courts have routinely held that plaintiffs seeking to represent a putative class may bring claims
under each of these state's antitrust laws after making similar antitrust allegations.  *In re Digital
Music Antitrust Litig.*, 812 F. Supp. 2d 390, 407 (S.D.N.Y. 2011)  (holding that Plaintiffs'
"allegations of intrastate conduct along with conduct throughout the United States in a
nationwide class action" were sufficient to support a claim under the antitrust laws of West
Virginia, South Dakota, and the District of Columbia); *see also Intel*, 496 F. Supp. 2d at 414

(same); *New Motor Vehicles*, *supra*, 350 F. Supp. 2d at 175 (same); Va. Code Ann. Section 59.1-9.5 ("[e]very contract, combination or conspiracy in restraint of trade or commerce of this Commonwealth is unlawful").  Here, IPPs have alleged that Defendants' conspiracy targeted the United States and caused individual class members within South Dakota, Virginia, West Virginia, and the District of Columbia to pay supra-competitive prices for Parking Heaters.  *See* Complaint at ¶¶ 63-103, 105-106, 123, 140, 144, 145.  These allegations are sufficient to prove restraint of trade within the jurisdiction for purposes of a motion to dismiss.[11]

### f.    New York

A claim is sufficiently alleged under N.Y. Gen. Bus. Law § 349 if "the complaint alleges a price-fixing scheme that resulted in New York consumers paying inflated prices for [the products], and that defendants took efforts to conceal their agreements from the New York plaintiffs and the indirect class."  *In re TFT-LCD Antitrust Litig.*, 586 F. Supp. 2d 1109, 1128 (N.D. Cal. 2008), citing *In re Dynamic Random Access Memory Antitrust Litig.*, ("*DRAM II*"), 536 F. Supp. 2d 1129, 1143 (N.D. Cal. 2008) ("[P]laintiffs need only allege – and ultimately show – that defendants' acts or practices have a broader impact on consumers at large.").  This is precisely what IPPs have alleged here.  *See* Complaint at ¶¶ 76-103.

Defendants claim that "only 'deceptive acts and practices' directed toward individuals 'in this state'" are prohibited by N.Y. Gen. Bus. Law § 349(a).  Motion at 23.  However, the Code properly and fully cited merely states that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."  IPPs have sufficiently pled Defendants' price-fixing scheme by alleging Defendants' conspiracy caused New York consumers to pay supra-competitive prices (*see* Complaint ¶¶ 147,

---

[11]  *See also In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 906-07 (N.D. Cal. 2008) (denying defendants' motion to dismiss, reasoning "the South Dakota legislature has an interest in protecting its residents from paying supra-competitive prices"); *New Motor Vehicles*, 350 F. Supp. at 172 (noting that "it is logical to assume that [South Dakota] intended its antitrust coverage to be as broad as possible.").

157) and Defendants' efforts to conceal their agreements through clandestine meetings and other coordinated activity.  Complaint ¶¶ 76-103.  See *TFT-LCD*, *supra*, 586 F. Supp. 2d at 1128. Therefore, IPPs' New York claims should be sustained.

### 2. IPPs Have Sufficiently Alleged Substantial Effects On The Commerce And Citizens Of The States For Which They Seek Damages

Defendants seek to dismiss IPPs' claims in North Carolina, Tennessee, Wisconsin, Montana, and Nebraska on the basis that IPPs have insufficiently pled that Defendants' conduct had substantial effects on the commerce or citizens of each of these states.  Motion at 23-24. This is incorrect.  IPPs' Complaint sufficiently alleges that consumers have paid supra-competitive prices for parking heaters as a result of Defendants' collusive activity.  This is the very purpose of the *Illinois Brick*-repealer statutes – to prevent the artificial raising of prices by restriction of trade or supply – and precisely what the IPPs have alleged in detail in the Complaint.  *See* Complaint ¶¶ 76-103.  Defendants' collusive activity caused prices for parking heaters to be higher than they would have been in a normal competitive market, and as a result, consumers in the states that Defendants now seek to dismiss from this case paid artificially high prices.  As such, IPPs' claims in North Carolina, Tennessee, Wisconsin, Montana, and Nebraska should remain and proceed.

### a. North Carolina, Tennessee, Wisconsin

IPPs' North Carolina, Tennessee and Wisconsin claims should proceed because IPPs have alleged intrastate conduct sufficient to support a claim under each State's antitrust statutes.

First, Defendants' argument that IPPs have failed to allege a sufficient intrastate nexus to North Carolina is not persuasive because the case they cite does not support their position.  In *Flonase*, the court denied defendants' motion to dismiss plaintiffs' claim under the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA," N.C. Gen. Stat. § 75-1.1) for several reasons, including the fact that North Carolina consumers paid supra-competitive prices in North Carolina for the price-fixed product at issue.  *Flonase*, 692 F. Supp. 2d at 540 ("[r]elief is available to a foreign plaintiff under the NCUDTPA against a resident defendant even over

-21-

alleged foreign injuries so long as the injuries have a 'substantial in-state effect on North Carolina trade or commerce.'").  In fact, courts have held that plaintiffs who allege that defendants sold products in North Carolina at supra-competitive prices could establish a claim under NCUDTPA even when defendants maintained no business operations within the state.  *In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1174 (N.D. Cal. 2015).  This is precisely what IPPs are alleging in their Complaint – that as a result of Defendants' conspiracy, consumers and citizens of North Carolina were impacted by paying artificially inflated prices.  *See* Complaint at ¶¶ 76-103, 120, and 137.  As such, IPPs' North Carolina claims should proceed.

Similarly, IPPs' Tennessee claims should also proceed.  The case cited by Defendants is distinguishable.  In *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 524 (Tenn. 2005) the court noted that "[t]he focus under the substantial effects standard, […] is not on the anticompetitive conduct itself but on the effects of the conduct on Tennessee commerce."  The court held that the plaintiff failed to state a claim under the Tennessee Trade Practices Act ("TTPA," Tenn. Code § 47-18-104) because it had not alleged conduct which had an effect on citizens in Tennessee.  But the plaintiff in that case was a New York corporation that solely purchased goods in New York, and was seeking a remedy through the TTPA on the mere allegation that the alleged price-fixing conspiracy had originated in part within Tennessee.  *Id*. By contrast, here, IPPs allege that consumers in Tennessee paid supra-competitive prices and suffered from decreased competition due to a nationwide price-fixing conspiracy that originated outside Tennessee.  *See* Complaint at ¶¶ 63-103, 104-106, 120, and 141.  These facts are sufficient to support a claim under the TTPA.  Indeed, the *Freeman* court noted that "[a]ccording to its plain language, the TTPA prohibits arrangements that decrease competition or affect the prices of goods even if those goods arrived in Tennessee through interstate commerce." *Freeman Indus.*, 172. S.W.3d at 522.

IPPs' Wisconsin claims should proceed as well because Defendants' argument that IPPs' price-fixing allegations do not meet the standard articulated in *Olstad v. Microsoft Corp*., 700 N.W.2d 139 (Wis. 2005), is incorrect.  In *Olstad,* the court held that a plaintiff filing an action

under Wisconsin's antitrust act must allege that "the conduct complained of 'substantially affects' the people of Wisconsin and has impacts in this state, even if the illegal activity resulting in those impacts occurred predominantly or exclusively outside this state." *Olstad, supra,* 700 N.W.2d at 141.  Indeed, "the public interest and welfare of the people of Wisconsin are substantially affected if prices of a product are fixed or supplies thereof are restricted." *Id*. at 146.  These are precisely the types of allegations IPPs have made.  *See* Complaint at ¶¶ 63-103, 120, 146.  Thus, IPPs' claims under Wisconsin's antitrust act should be upheld.

### b.    Montana, Nebraska

In *In re Auto Parts Antitrust Litig*., 50 F. Supp. 3d 869, 893 (E.D. Mich. 2014), the court denied defendants' motion to dismiss plaintiffs' claim under the Consumer Protection Law of Montana, holding that "EPPs [*i.e.*, indirect-purchaser consumers] have alleged that Defendants' conduct was directed at the automotive parts market in all states, including Montana; that the conduct had the reasonably foreseeable effect of raising the price for finished products in all states, including Montana, and EPPs purchased price-fixed products in Montana, paying supracompetitive prices for those products."  IPPs ihave made equivalent allegations.  *See* Complaint at ¶¶ 104-11, 154.

With respect to IPPs' Nebraska claims, the Nebraska Supreme Court has previously addressed the legislative intent of the statute, writing that "[w]e find no limitation on who may sue for violations of §§ 59-1602 to 59-1606 except that such violations must directly or indirectly affect the people of Nebraska" and that "[t]he Act was intended to be an antitrust measure to protect Nebraska consumers from monopolies and price-fixing conspiracies." *Arthur v. Microsoft Corp*., 267 Neb. 586, 597, 598-99 (2004) (emphasis added).  This is precisely what IPPs' are seeking.  IPPs' allege that Nebraska residents paid supra-competitive prices for Parking Heaters due to Defendants' nationwide conspiracy.  *See* Complaint at ¶¶ 63-103, 147, and 155.  Dismissing these claims would run contrary to the intent of the Nebraska statute.  IPPs' Montana and Nebraska claims should proceed.

### c.      Utah

For the reasons discussed in Section B, *supra*, Defendant's motion to dismiss the Utah claims for lack of a named IPP from Utah should be denied.

### D.      IPPs Have Standing To Maintain Price-Fixing Claims

### 1.      Virginia

Defendants' argument with regard to Virginia focuses on a "harmonization provision" and proceeds from the premise that *Illinois Brick* applies to bar state indirect purchaser claims unless a state affirmatively says otherwise, either through a repealer statute or a decision of the state's highest court.  Motion at 24-25.  This premise is flawed.  The Virginia Antitrust Act's harmonization provision states:  "This chapter shall be applied and construed to effectuate its general purposes in harmony with judicial interpretation of comparable federal statutory provisions."  Va. Code Ann. §59.1-9.17.  But this section of the Virginia Antitrust Act was enacted in 1974 – three years **prior** to *Illinois Brick* – when indirect purchasers were still able to sue under Section 1 of the Sherman Act.

Further, there are differences between the Virginia Antitrust Act and Sherman Act concerning which no "harmonization" is possible.  For example, the purpose of the Virginia Antitrust Act has no comparable provision in federal antitrust laws: "The purpose of this chapter is to promote the free market system in the economy of this Commonwealth by prohibiting restraints of trade and monopolistic practices that act or tend to act to decrease competition.  This chapter shall be construed **in accordance with the legislative purpose to implement fully** the Commonwealth's police power to regulate commerce."  Va. Code Ann. §59.1-9.2 (emphasis added).  In addition, section 59.1-9.12 permits an antitrust suit for single damages by "[a]ny person injured in his business or property by reason of a violation of this chapter[.]"  But unlike the Sherman Act, this section renders treble damages discretionary, not mandatory.  *Id*.  Neither the Defendants, nor the cited authorities, provide a basis upon which the single-damage remedy provided by the Virginia Antitrust Act should be subject to harmonization to a non-existent provision in federal law.  In view of the differences between the Virginia Antitrust Act and the

Sherman Act, the Act's passage before *Illinois Brick*, and the absence of binding authority affirmatively barring Virginia indirect purchasers from recovery, these claims should remain.

### 2.      Missouri

Defendants argue that in order for IPPs to prevail on their Missouri Merchandising Practices Act ("MMPA," Mo. Rev. Stat. § 407.010 *et seq.*) claim, they need to "differentiate their antitrust allegations from any fact or theory supporting their consumer protection claim . . . ." Motion at 25-26. Defendants are incorrect. In *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 946 F. Supp. 2d 554 (E.D. La. 2013), the court held that indirect purchasers could bring consumer protection claims under the MMPA based on allegations of an antitrust conspiracy. *Id.* at 571. The court based its reasoning on a decision from the Missouri Supreme Court in *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667 (Mo. 2007), which held that parties other than direct purchasers could bring actions under the MMPA. *Id.* at 570. Thus, the court held that, "based on *Gibbons*, that if faced with the issue today, the Missouri Supreme Court would allow indirect suits under the MMPA when a plaintiff has otherwise made out an MMPA claim." *Pool Products*, 946 F. Supp. 2d at 571. Other federal courts have reached the same conclusion. *See In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-2420, 2014 WL 4955377, at *19 (N.D. Cal. Oct. 2, 2014) (same); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M-07-1827, 2011 WL 4501223, *14-*15 (N.D. Cal. Sep. 28, 2011) (same).

### 3.      South Carolina

Defendants claim that as indirect purchasers, IPPs are prohibited from maintaining a claim under South Carolina's Unfair Trade Practices Act ("UTPA," S.C. Code Ann. § 39-5-10). However, defendants provide no authority for this proposition. The lone case they cite, *In re Microsoft Corp. Antitrust Litig.*, 401 F. Supp. 2d 461, 464 (D. Md. 2005), concerned claims for unjust enrichment, not claims pursuant to South Carolina's UTPA. Because there is no case-law precedent prohibiting indirect-purchaser antitrust claims under South Carolina law, IPPs UTPA claims should remain.

### 4.      Oregon and New Hampshire

Defendants argue that IPPs should not be able to recover damages based on alleged conspiratorial conduct prior to the passage of repealer statutes in Oregon and New Hampshire. Motion at 26-27.  Defendants are incorrect.[12]  Prior to January 1, 2010, Oregon did not permit indirect purchasers to sue under Oregon's antitrust law.  However, the Court should apply Oregon's new repealer provision retroactively.  *See* Or. Rev. Stat. § 646.780.  While new statutes are often applied prospectively, such new statutes "impair existing rights, create new obligations or impose additional duties with respect to past transactions."  *Strizver v. Wilsey*, 210 Or.App. 33, 150 P.3d 10, 12 (2006).  Here, the Oregon repealer provision merely created a new mechanism for private-plaintiff indirect purchasers to recover for the same underlying antitrust violation committed by Defendants throughout the Class Period, and did not impair existing rights or impose additional duties.  Thus, the Court should apply the Oregon Antitrust Act retrospectively.[13]

New Hampshire's antitrust laws began conferring standing on indirect purchasers on January 1, 2008.  Just as with Oregon's statute, the Court should apply New Hampshire's statute retroactively.  "[W]hen a statute is remedial . . . in nature, it may be applied to pending cases retroactively."  *In re Silk*, 937 A.2d 900, 904 (N.H. 2007).  In order to determine whether a statute is retrospective or prospective, a court should examine whether the new law "takes away or impairs vested rights, acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." *Eldridge v. Eldridge*, 620 A.2d 1031, 1033 (N.H. 1993).  Here, when New Hampshire amended its antitrust act to permit indirect purchasers to sue, the new statute did not create a new duty or

---

[12]  Defendants do not argue that IPPs' claims seeking such damages for alleged conduct beginning in 2010 in Oregon and 2008 in New Hampshire should be dismissed.
[13] If the Court declines to apply Oregon's antitrust statute retrospectively, IPPs' claims based on alleged conspiratorial conduct beginning January 1, 2010 should remain – a position which Defendants do not dispute.

liability for past conduct.  Defendants' conduct is and always has been illegal under New Hampshire law.  Rather, the statute merely created a mechanism for indirect-purchaser recovery, and is thus remedial.  As in *Eldridge*, the change creates a procedure for enforcing already existing state antitrust laws, and Defendants' obligation to comply with those laws has not changed.

### E.  Arkansas, Rhode Island, and Michigan State Statutes Are Applicable To Price Fixing

#### 1.  Arkansas

The Arkansas Deceptive Trade Practices Act ("ADTPA") prohibits certain enumerated "[d]eceptive and unconscionable trade practices," as well as "any other unconscionable, false, or deceptive act or practice in business, commerce, or trade."  Ark. Code § 4-88-107(a)(10).  The ADTPA is construed liberally "to protect the interest of both the consumer public and legitimate business community."  *Curtis Lumber Co. v. La. Pacific Corp.*, 618 F.3d 762, 780 (8th Cir. 2010); *accord State ex rel. Bryant v. R & A Inv. Co.*, 985 S.W.2d 299, 302-03 (Ark. 1999) (concluding the word 'unconscionable' illustrates that a liberal construction of the ADTPA is appropriate).  The ADTPA is also meant to cover acts "violative of public policy or a statute." *Baptist Health v. Murphy*, 226 S.W.3d 800, 811 (Ark. 2006).  IPPs are businesses and consumers who have been injured by Defendants' deceptive conduct – the precise categories of plaintiffs the ADTPA was enacted to protect.  Complaint ¶¶ 106, 111(d), 118(d).

Despite this, Defendants argue that the ADTPA does not apply to antitrust violations. Motion at 27.  Yet, numerous courts have held that the ADTPA does provide consumers relief from antitrust violations.  *See*, *e.g., Auto Parts.*, 29 F. Supp. 3d at 1008-09 (permitting ADTPA claim alleging price fixing to proceed).[14]

---

[14] *See also In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 582–83 (M.D. Pa. 2009) (same); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1109 (N.D. Cal. 2007) (allowing ADTPA claim alleging antitrust violation to proceed); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 4955377, at *22-23 (N.D. Cal. Oct. 2, 2014) (finding price fixing is the type of conduct prohibited by the ADTPA); *Fond du Lac Bumper Exchange, Inc. v. Jui Li Enterprise Co., Ltd.*, Nos. 09-CV-

Moreover, IPPs have adequately pleaded the ADTPA claim by alleging that Defendants' conduct was unconscionable and deceptive. *See Auto Parts*, 29 F. Supp. 3d at 1008-09 (to state a claim under this statute, a plaintiff must allege that defendants engaged in an unconscionable, false, or deceptive act or practice); *Independence County v. Pfizer, Inc.*, 534 F. Supp. 2d 882, 886 (E.D. Ark. 2008) (defining an unconscionable act as one that "affronts the sense of justice, decency, or reasonableness, including acts that violate public policy or a statute") (citing *Baptist Health*, 226 S.W.3d at 811). IPPs have alleged facts which plausibly show that Defendants conspired, in secret, to fix the prices, of Parking Heaters resulting in IPPs being overcharged and the Defendants reaping additional profit. Complaint ¶¶ 77–94, 111(b), 118(b), 148–49; *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1161 (N.D. Cal. 2009) (price fixing allegations constitute a violation of public policy and sufficiently state an ADTPA claim).

### 2.    Rhode Island

Rhode Island's Unfair Trade Practices and Consumer Protection Act ("UTPCPA"), prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." R.I. Gen Laws § 6-13.1-2. The UTPCPA further defines what acts, practices, and methods of competition are unfair or deceptive:

- making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

- engaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding;

- engaging in any act or practice that is unfair or deceptive to the consumer; and

- using any other methods, acts, or practices that mislead or deceive members of the public in a material respect.

*Id.* § 6-13.1-1(xi)–(xiv). The UTPCPA is "intended to declare unlawful a broad variety of activities that are unfair or deceptive, as well as to provide a remedy to consumers who have

---

00852, 11-CV-00162, 2012 WL 3841397, at *6 (E.D. Wis. Sept. 5, 2012) (concluding that indirect purchaser plaintiffs may bring claims for price fixing under the ADTPA).

sustained financial losses as a result of such activities." *Long v. Dell, Inc.*, 93 A.3d 988, 1000 (R.I. 2014).

Again, because price fixing is not specifically mentioned in the statute, Defendants contend it is not prohibited as a deceptive or unfair act. Motion at 27. But, as with the ADTPA, courts have repeatedly held that the UTPCPA is applicable to price fixing claims. *See*, *e.g.*, *Auto Parts*, 29 F. Supp. 3d at 1014; *Chocolate Confectionary*, 602 F. Supp. 2d at 586; *DRAM II*, 536 F. Supp. at 1144-45.

Similarly, IPPs have adequately pleaded the UTPCPA claim by alleging that Defendants' conduct was deceptive, misleading, and unfair. *Ames v. Oceanside Welding and Towing Co., Inc.*, 767 A.2d 677, 681 (R.I. 2001) (to determine unfairness, courts consider "whether the practice offends public policy as it has been established by statutes, the common law, or otherwise; whether it is immoral, unethical, oppressive, or unscrupulous; [and] whether it causes substantial injury to consumers."). IPPs have alleged that Defendants, through their secret conspiracy, unfairly set prices of Parking Heaters so as to deceive, mislead, and confuse the consuming public into thinking the product's price was set by natural market influences. Complaint ¶¶ 77–94, 148. Defendants' allegedly deceitful conduct is likely to offend public policy, as established by statute and common law, and has caused injury to IPPs. *Id*. ¶ 106, 111(d), 118(d).

### 3.    Michigan

Defendants assert that the statute cited by IPPs in support of their Michigan indirect-purchaser, antitrust class action applies only to monopolies and cannot be used where the alleged offense is grounded in conspiracy claims. Here, rather than referring to Michigan Compiled Laws, Section 445.773 (anti-monopoly), IPPs should have cited Michigan Compiled Laws, Section 445.772 (prohibiting price-fixing conspiracies). Due to the IPPs' scrivener's error, IPPs respectfully request that the Defendants stipulate to changing the reference from "445.773" to "445.772", which is the intended citation.

**F.     Class Actions Are Permitted Under Relevant State Law**

State statutes that purport to bar class actions are subject to *Shady Grove Orthopedic Assoc. v. Allstate Ins. Co.*, 559 U.S. 393, 401 (2010), which holds that Rule 23, Fed. R. Civ. P., governs the availability of pleading a class action in federal court.  In *Shady Grove*, a majority of justices held that Rule 23 determined whether a case could proceed as a class action because it is a "categorical rule" that "entitl[es] a plaintiff whose suit meets the specified criteria to pursue his claim as a class action." *Id.* at 398.  In holding that Rule 23 applied, and not the New York state ban on class actions at issue in the case, the Court noted that "it is not the substantive or procedural nature or purpose of the affected state law that matters, but the substantive or procedural nature of the Federal Rule." *Id.* at 410.  Rule 23 governs procedure for the maintenance of class actions and therefore trumps conflicting state laws.

The Second Circuit has not yet subsequently applied *Shady Grove* to a state statute that bans class actions, but has indicated that, in light of *Shady Grove*, "federal law and not state procedural law governs class actions in federal court."  *Gold v. N.Y. Life Ins. Co.*, 730 F.3d 137, 140 n.1 (2d Cir. 2013); *see also Bank v. Independence Energy Grp. LLC*, 736 F.3d 660, 661 (2d Cir. 2013) (stating that *Shady Grove* overturned the rationale that the *Erie* doctrine required application of state law class-action procedures); *Cappiello v. ICD Publications, Inc.*, 720 F.3d 109, 114 (2d Cir. 2013) (quoting *Shady Grove* for the premise that "where a valid federal statute applies, '[w]e do not wade into Erie's murky waters'").  More recently, in *Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331 (11th Cir. 2015), the Eleventh Circuit explicitly rejected an argument mirroring the one asserted by Defendants here, that an Alabama state statute did not authorize a private class action because the state ban was substantive under Justice Stevens' concurrence in *Shady Grove*.  *Id.* at 1333, 1335.  The Eleventh Circuit concluded that the manner by which a state chooses to organize its statutes "affects the analysis not at all." *Id.* at 1336.  Further, the court in *Lisk* stated:

> Surely the New York legislature could not change the *Shady Grove* holding simply by reenacting the same provision as part of the statutory-interest statute.  Surely an identical ban on statutory-

> interest class actions adopted by another state would not override
> Rule 23 just because it was placed in a different part of the state's
> code.  The goal of national uniformity that underlies the federal
> rules ought not be sacrificed on so insubstantial a ground.  And
> more importantly, the question whether a federal rule abridges,
> enlarges, or modifies a substantive right turns on matters of
> substance – not on the placement of a statute within a state code.

*Id*.  Just as in *Lisk* and elsewhere, state statutes in Montana, South Carolina, and Illinois that

restrict class actions in state court should not apply in this federal action.  *See* 7A Charles Alan

Wright, *et al.*, *Federal Practice & Procedure*, § 1758 (3d ed.) ("[I]t now is clear that Rule 23

controls whether a class action may be maintained, regardless of a conflicting state law.").

Contrary to Defendants' assertion, the District of Montana recently applied *Shady Grove*

to determine that Montana's bar on class actions is procedural and thus invalid in federal court.

*Wittman v. CB1, Inc.*, No. CV 15-105, 2016 WL 3093427, at *6 (D. Mont. June 1, 2016).  There,

the court reasoned:

> The prohibition alters only the procedural means by which that
> remedy may be pursued. The class action prohibition itself does
> not add, subtract, or define any of the necessary elements of the
> claim …. Each individual plaintiff could proceed with a suit under
> the MCPA and receive the same remedy regardless of whether the
> plaintiff brought suit individually or as part of a class action.

*Id*.  Other courts are in agreement as to the Montana statute.  *See, e.g., In re Hydroxycut Mktg. &*

*Sales Practices Litig*., 299 F.R.D. 648, 654 (S.D. Cal. 2014). [15]

Likewise, *Shady Grove* dictates that Rule 23 also governs the availability of a federal

class action under South Carolina law  To date, the case law is split on whether Rule 23 controls

as to the South Carolina Unfair Trade Practices Act, but several courts have concluded that Rule

23 trumps the state rule.  *See*, *e.g., Suchanek v. Sturm Foods, Inc.*, 311 F.R.D. 239, 264 (S.D. Ill.

2015) (endorsing *Lisk* rationale and concluding Rule 23 controls over South Carolina state class

action bar); *Hydroxycut*, 299 F.R.D. at 654 (denying motion to dismiss and concluding state

prohibitions against class actions only affect how claims are processed and do not run afoul of

---

[15] *In re Packaged Ice Antitrust Litigation* is unpersuasive because the district court did not decide
the issue relative to Montana.  779 F. Supp. 2d 642, 661 (E.D. Mich. 2011).

the Rules Enabling Act); *In re Optical Disk Drive Antitrust Litig*., No. 3:10-md-2143, 2012 WL 1366718, at *8 (N.D. Cal. Apr. 19, 2012) (concluding that plaintiffs' claims were not barred by South Carolina law limiting class actions, citing *Shady Grove*'s holding "that Rule 23 applies in Federal Court diversity actions").  This Court should adopt the persuasive reasoning of these cases and reject Defendants' attempt to dismiss IPPs class action claims under South Carolina law.

As to Illinois, IPPs respectfully suggest that Rule 23 controls regardless of where the conflicting state law is placed within the state code.  *See Lisk*, 792 F.3d at 1336 ("Surely the New York legislature could not change the *Shady Grove* holding simply by reenacting the same provision as part of the statutory-interest statute."); 7A Charles Alan Wright, *et al., Federal Practice & Procedure,* § 1758 (3d ed.) (stating Rule 23 controls whether a class action may be maintained, regardless of conflicting state law).

### G.    IPPs Have Properly Pleaded Consumer-Protection Claims

Defendants argue that IPPs' claims under the consumer-protection laws of 13 states (Count IV of the Complaint) lack sufficient factual allegations to state a claim.  Motion, Section "G."  As the Complaint makes clear, however, the consumer-protection claims arise from Defendants' anti-competitive conduct.  As recognized by numerous courts, these detailed factual allegations of a classic horizontal price-fixing conspiracy state a valid claim under the consumer-protection statutes.

For example, in *In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 893-895 (E.D. Pa. 2012), the court rejected the defendants' contention that allegations of price-fixing were insufficient to state claims under the consumer-protection laws of California:  "The Court agrees that it is an analytically sensible and entirely fair operation of pleading standards and substantive law to conclude that the [indirect-purchaser complaint's] allegations giving rise to alleged antitrust violations also give rise to the Plaintiffs [California] UCL claim."  The *Processed Egg* court likewise rejected the pleading challenges to the Florida and Massachusetts consumer-protection laws.  *Id*. at 899-904.

-32-

Similarly, in *Auto Parts*, 29 F. Supp. 3d at 1008, the court found that "plaintiffs'

allegation that they were overcharged pursuant to a conspiracy to fix prices" was a sufficient

factual basis to maintain a claim under the Arkansas consumer-protection statute.  The *Auto*

*Parts* court also denied the defendants' pleading challenges to claims arising under the

consumer-protection statutes of New York.  *Id.* at 1009-1010.  *See also DRAM II*, 536 F. Supp.

2d at 1145 (holding that plaintiffs' complaint "fairly alleges unscrupulous conduct by

defendants, at the very least, and that such conduct caused injury to consumers in Rhode Island,

as well as consumers across the country"); *Intel*, 496 F. Supp. 2d at 418 (holding allegations of

higher prices sufficient to state a claim under Utah's consumer protection law).

Here, Defendants cite to three "reverse-payment settlement" cases.[16]  In those cases, the

courts found that the plaintiffs' reverse-payment, supply-restriction antitrust theory of harm,

premised entirely on the Supreme Court's recent decision in *FTC v. Actavis*, 133 S. Ct. 2223

(2013), was insufficient to maintain a claim under some consumer-protection statutes.  By

contrast, in the instant case, IPPs allege a *per se* illegal horizontal price-fixing conspiracy,

exactly the kind of conduct at issue in *Processed Egg, Auto Parts, DRAM*, and *Intel*, which the

courts found to be well-suited to support state-law consumer protection claims.

Moreover, Defendants' Motion does not identify any specific deficiencies with the

consumer-protection claims as pleaded, nor does it discuss any particular consumer-protection

statute.  Instead, Defendants simply cite the reverse-payment cases and urge a blanket dismissal

of all consumer-protection claims here.  But this is not enough to warrant dismissal.  *In re*

*Domestic Drywall Antitrust Litig.*, MDL No. 13-2437, 2016 WL 3769680 at *11 (E.D. Pa. July

13, 2016) ("To the extent Defendants' one-paragraph argument is an invitation for the Court to

comb through all of Plaintiffs' consumer protection claims and determine whether the elements

---

[16] *In re Opana ER Antitrust Litig.*, Case No. 14-C-10150, 2016 WL 521005 (N.D. Ill. Feb. 10, 2016); *In re Actos End Payor Antitrust Litig.*, No. 13-CV-9244, 2015 WL 5610752 (S.D.N.Y. Sept. 22, 2015); and *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224 (D. Conn. 2015).

have been adequately pleaded, the Court respectfully declines the invitation.")  Accordingly, Defendants' challenges to the consumer-protection claims of Count IV should be rejected.

### H.   Under The Fourth Claim For Relief, State Consumer Protection Statutes Definitively Apply to the Claims Asserted by the Class

#### 1.   Missouri, Montana, and Rhode Island

Skipping most of the factual allegations, Defendants argue various consumer protection statutes are inapplicable to the entire class in Missouri, Montana and Rhode Island.  As other courts have held, however, in the context of antitrust cases such as the one present here, these statutes, in fact, apply to protect indirect class members.  *See generally, Chocolate Confectionary,* 602 F. Supp. 2d at 586; *DRAM II*, 536 F. Supp. 2d at 1144-45.

Defendants initially contend that the consumer statutes only pertain to products purchased for "personal, family and household" use.  *See* Motion at 36.  They assert that IPPs have not specifically alleged "personal" use of the Parking Heaters, because the defined class contained the term "commercial – *i.e.*, business purposes."  *Id.*  However, in reviewing claims of this nature, courts have in fact given a broad interpretation to how personal use may arise in antitrust actions.  *See*, *e.g., In re TFT-LCD*, 586 F. Supp. 2d at 1130 (finding that circumstances might exist where a "[commercial] entity may allege that its purchases were primarily for personal, family or household purposes.")

Further, and critically important, the Complaint allegations never precluded personal use of the product inside the commercial vehicles despite Defendants' claims otherwise.  *See* Complaint ¶¶ 29-31. ("use *in* commercial vehicles" as opposed to use for commercial vehicles) (emphasis added); compare *Benedetto v. GMAC*, No. 00-0912-cv-w-5, 2001 U.S. Dist. LEXIS 25286, at *16-17 (W.D. Mo. Apr. 5, 2001) ("[I]ndividuals who purchase merchandise for a business" may not have standing, but, "[i]n contrast, there is no suggestion…that [the business plaintiff] did not purchase the [product] for personal use"); *see also*, Complaint ¶ 41 ("Operators … rest or sleep in their vehicles in cold weather or at night and need a way to keep warm").

Defendants next argue that businesses are not 'protected' under the Missouri and Montana statutes for the claims before this Court. Montana's Consumer Protection Act ("MCPA"), protects "consumers." Mont. Code §§ 30-14-103, *et seq*. While the statute has a "broadly interpreted definition of consumer," (*Walden v. D B & D, LLC*, No. CV-12-138, 2013 WL 322103 at *2 (D. Mont. Jan. 28, 2013)), "[t]he Montana Supreme Court has not discussed the definition of 'consumer'…under the MCPA." *Vinion v. Amgen, Inc*., No. 9:03-cv-00202, 2004 U.S. Dist. LEXIS 31626, at *11 (D. Mont. Aug. 30, 2004). However, a recent Montana Supreme Court case provides some insight, indicating that the definition of consumer may very well include businesses and businesspeople. *Rohrer v. Knudson*, 203 P.3d 759, 763 (Mont. 2009) (citing favorably a passage that included: "consumers (or competitors or other businessmen).") This rationale comports with the plain reading of the statute. Mont. Code §§ 30-14-102 ("Definitions… (1) "Consumer" means a person…" and "(6) 'Person' means …corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity.")[17]

Similarly, Defendants' exclusion of businesses from the protection of the Missouri consumer statute contradicts the plain reading of the statute. The statute specifically states that "any person" may bring a private civil action or class action. Mo. Rev. Stat. § 407.025. The expansive definition of person has been clearly stated to include business entities. Mo. Rev. Stat. § 407.010 ("Definitions: As used in sections 407.010 to 407.130, the following words and terms mean…(5) 'Person', any…partnership, firm, for-profit or not-for-profit corporation, whether domestic or foreign, company…business entity or association"). This interpretation falls in line with Missouri's generous treatment and plain reading of the statute. In a separate but nonetheless relevant context, the Supreme Court of Missouri "decline[d] to impose…a significant limitation on Missouri consumers [and found that] precedent consistently reinforces

---

[17] Defendants cite to one case in support of their argument, but the case failed to analyze the issue given the "absence of any authority from Montana." *In re Lidoderm*, 103 F. Supp. 3d at 1165. Here, IPPs have offered authorities indicating that the plain reading of the statute, and Montana's favorable treatment of consumers, gives weight to plaintiffs' position.

the plain language and spirit of the statute to further the ultimate objective of consumer

protection, regardless of whether the suit is filed by the state or by an individual." *Gibbons*, 216

S.W.3d at 670.  Accordingly, the Missouri statute in fact supports plaintiffs' claims.[18]

In short, contrary to Defendants' position, the statutes of these three states applies to the

claims asserted in the complaint.

### 2.      New York

Under N.Y. Gen. Bus. Law § 349, *et seq.*, a plaintiff need only allege (1) consumer-

oriented conduct that is (2) materially deceptive and that (3) conduct resulted in plaintiff

suffering an injury.  *MVB Collision, Inc. v Allstate Ins. Co.*, 129 A.D.3d 1041, 1042-1043 (N.Y.

App. Div. 2d Dep't 2015).  The statute is broadly applicable and liberally construed.  *Karlin v.

IVF Am., Inc.*, 93 N.Y.2d 282, 290 (N.Y. 1999); *see also, New York v. Feldman*, 210 F. Supp. 2d

294, 301 (S.D.N.Y. 2002).  As noted below, Defendants' arguments have no impact on the

viability of the IPPs' claims under New York law.[19]

First, Defendants mistakenly claim that IPPs "have not asserted any injuries" resulting

from the alleged deception.  *See* Motion at 37.  The Complaint speaks otherwise. *See* Complaint

¶¶ 7, 147.  Second, Defendants argue that IPPs have not alleged materially deceptive acts.  The

Complaint more than adequately alleges and describes the deceptive practices employed by

---

[18] Defendants cite to two cases to support the proposition that Missouri's consumer statute
excludes businesses.  *See In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*, No. 1:14-md-2508,
2015 WL 5166014 (E.D. Tenn. June 24, 2015); *In re Auto Parts Antitrust Litig.*, No. 12-md-
02311, 2014 WL 2993753 (E.D. Mich. July 3, 2014).  Neither decision, however, provides
meaningful analysis of the statute, and both note the dearth of available authority.  In one other
case, however, the court found that a business plaintiff was suitable, so long as the business
plaintiff purchased the product for personal use.  *Benedetto v. GMAC*, No. 00-0912-cv-w-5, 2001
U.S. Dist. LEXIS 25286, at *16-17 (W.D. Mo. Apr. 5, 2001).
[19] Defendants cite to *Paltre v. General Motors Corp.*, 26 A.D.3d 481 (N.Y. App. Div. 2d Dep't
2006) for support.  In *Paltre*, the allegations involved a group conspiracy to boycott Canadian
products from the U.S. market.  The refusal to allow Canadian products to enter the U.S. was not
necessarily deceptive. Here, the price-fixing scheme was deceptive.  *See* Complaint ¶ 105
(conspiracy to restrain, suppress and eliminate competition); *compare Cox v. Microsoft Corp.*, 8
A.D.3d 39, 40 (N.Y. App. Div. 1st Dep't 2004) (finding deceptive acts in "secret agreements …
to inhibit competition").

Defendants.  *See generally*, Complaint ¶¶ 76-103 (alleging, among other things, "clandestine meetings" aimed at fixing, raising and maintaining prices); *compare Feldman*, 210 F. Supp. 2d at 297-298 (finding "secret bidding sessions" sufficient evidence of a deceptive act); *see also, In re TFT-LCD*, 586 F. Supp. 2d at 1128 (interpreting New York's § 349, and finding plaintiffs to have sufficiently alleged deceptive actions through consumer-oriented, price-fixing conduct). Third, and finally, Defendants wrongly state that the deceptive conduct must be aimed specifically at consumers.  As courts have held, the conduct need only demonstrate "broad impact" on the consumer at large.  *Allstate Ins. Co. v. Rozenberg*, 590 F. Supp. 2d 384, 395 (E.D.N.Y. 2008) (case involving business entity plaintiffs (insurers) where the court held that defendants' deceptive scheme would raise premium prices for consumers and that, on a motion to dismiss, this sufficiently demonstrated ramifications for the public at large).  IPPs have sufficiently alleged a violation of New York's consumer protection statute.

### 3.     Vermont

Defendants erroneously assert that Vermont's consumer protection statute, the Vermont Consumer Fraud Act ("VCFA," Stat. Ann. 9 §§ 2453, *et seq*.), does not apply because Defendants do not sell directly to consumers.  *See* Motion at 37.  Not only does this misinterpret the VCFA, but failure to hold Defendants responsible under the statute would go against the weight of state case law.  The Vermont Supreme Court has repeatedly held:

> The Legislature clearly intended the VCFA to have as broad a reach as possible in order to best protect consumers against unfair trade practices.  This intent underlies a private remedy section that allows suits by "any consumer" with no suggestion of a distinction between direct and indirect purchasers.

*Elkins v. Microsoft Corp.*, 174 Vt. 328, 331 (Vt. 2002) (antitrust context); *see also, Sawyer v. Robson*, 915 A.2d 1298, 1303 (Vt. 2006) ("under the plain meaning of the statutory language there was … no requirement that the defendant sold goods or services directly to the plaintiff").

The crux of Defendants' argument is that they are not sellers, as defined by the statute, and thus not liable.[20]   This reliance belies the fact that other non-sellers may be subject to the statute's expanded reach.   *Foti Fuels, Inc. v. Kurrle Corp.*, 90 A.3d 885, 892 (Vt. 2013) (noting that the scope of potential plaintiffs and defendants under the [VCFA] was deliberately broadened over time to include "other violators") (internal quotations omitted).   Accordingly, the VCFA applies to Defendants in this case.

---

[20] Defendants rely upon a singular case for their Vermont argument: *In re Solodyn* (*Minocycline Hydrochloride*) *Antitrust Litig.*, No. 14-md-02503, 2015 WL 5458570 (D. Mass. Sept. 16, 2015). The opinion is not only distinguishable, but flawed.  First, the *Solodyn* court cited only one Vermont lower court decision, which held indirect plaintiffs must at least acquire the product to have standing.  *Fucile v. Visa U.S.A. Inc.*, No. S1560-03-CNC, 2004 WL 3030037 (Vt. Super. Ct. Dec. 27, 2004) ("Mr. Fucile is far more remote than the plaintiff in *Elkins*. In *Elkins*, the plaintiff had actually acquired the product that was allegedly tainted by unfair methods of competition.")  Clearly, this distinction is inapplicable to the present case where the class is comprised of alleged purchasers.  Second, and more importantly, the *Solodyn* court concluded inaccurately that Vermont's statute requires "Defendants [to] sell directly to consumers."  *In re Solodyn*, 2015 WL 5458570, at *18.  This is an unsupported and erroneous depiction of the law that contradicts the Supreme Court of Vermont, as discussed above.

## III.   CONCLUSION

For all of the foregoing reasons, IPPs respectfully request that the Court deny

Defendants' Motion.

Respectfully submitted,                            Dated:  August 5, 2016


/s/ Francis O. Scarpulla                           /s/ Josef D. Cooper
    Francis O. Scarpulla                               Josef D. Cooper

Francis O. Scarpulla (*pro hac vice*)              Josef D. Cooper (*pro hac vice*)
Patrick B. Clayton (*pro hac vice*)                Tracy R. Kirkham (*pro hac vice*)
LAW OFFICES OF FRANCIS O.                          John D. Bogdanov (*pro hac vice*)
  SCARPULLA                                        COOPER & KIRKHAM, P.C.
456 Montgomery Street                              357 Tehama Street
17th Floor                                         Second Floor
San Francisco, CA 94104                            San Francisco, CA 94103
Telephone:   (415) 788-7210                        Telephone: (415) 788-3030
Facsimile:  (415) 788-0706                         Facsimile: (415) 882-7040
Email: fos@scarpullalaw.com                        Email: jdc@coopkirk.com
          pbc@scarpullalaw.com                               trk@coopkirk.com
                                                             jdb@coopkirk.com

*Interim Co-Lead Counsel for Indirect-Purchaser Plaintiffs*

Steven N. Williams
Cotchett, Pitre & McCarthy, LLP
40 Worth Street, 10th Floor
New York, NY 10013
Telephone:  (212) 201-6820
Facsimile:  (646) 219-6678
Email: swilliams@cpmlegal.com

San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577

*Liason Counsel for Indirect-Purchaser Plaintiffs*

W. Joseph Bruckner                                 Daniel E. Gustafson
Heidi M. Silton                                    Jason S. Kilene
Elizabeth R. Odette                                Daniel C. Hedlund
Devona L. Wells                                    Daniel J. Nordin

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone:  (612) 339-6900
Facsimile:  (612) 339-0981
Email: wjbruckner@locklaw.com
      hsilton@locklaw.com
      erodette@locklaw.com
      dlwells@locklaw.com

William M. Audet
AUDET & PARTNERS, LLP
711 Van Ness Avenue, Suite 500
San Francisco CA 94102
Telephone:  (415) 568-2555
Facsimile:  (415) 568-2556
Email: waudet@audetlaw.com

GUSTAFSON GLUEK PLLC
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone:  (612) 333-8844
Facsimile:  (612) 339-6622
Email: dgustafson@gustafsongluek.com
      jkilene@gustafsongluek.com
      dhedlund@gustafsongluek.com
      dnordin@gustafsongluek.com

Steve W. Berman
HAGENS BERMAN SOBOL
  SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
Email: steve@hbsslaw.com

Jason Zweig
HAGENS BERMAN SOBOL SHAPIRO
LLP
555 Fifth Avenue, Suite 1700
New York, NY 10017
Telephone:  (212) 752-5455
Facsimile:  (917) 210-3980
Email: jasonz@hbsslaw.com

Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO
LLP
1144 West Lake Street, Suite 400
Oak Park, IL 60301
Telephone:  (708) 628-4949
Facsimile:  (708) 628-4950
Email: beth@hbsslaw.com

*Counsel for Indirect-Purchaser Plaintiffs*